**UNITED INTERNATIONAL
INVESTIGATIVE SERVICES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 407–89C.

United States Court of Federal Claims.

April 3, 1995.

See also, 26 Cl.Ct. 892.

Robert E. Deso, Washington, DC, attorney of record, for plaintiff. Deso, Thomas, Spevack, Weitzman & Rost, P.C., of counsel.

Hal S. Shapiro, Dept. of Justice, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. David M. Cohen, Director; Jeanne E. Davidson, Asst. Director; Lisa B. Donis; and Maj. H. Josseph Batey, Dept. of Air Force, of counsel.

## OPINION AND ORDER

FUTEY, Judge.

This government contract case is before the court after a trial on the merits. Plaintiff contracted with defendant to supply security services for an Air Force base. Plaintiff argues that it incurred additional expenses due to changes defendant imposed on the contract. Defendant, however, argues that notwithstanding the fact that plaintiff executed two contract modifications, each constituting a complete accord and satisfaction of plaintiff's claims for further contract adjust-

ments, it did not make any changes to the terms of the contract.

*Facts*

Because the court issued two detailed opinions reciting the factual basis of this case, only the critical facts will be set forth in this opinion. On August 16, 1985, defendant, the United States Department of the Air Force, issued an invitation for sealed bids on a contract to provide security services at New Boston Air Force Tracking Station, Amherst, New Hampshire. Plaintiff, United International Investigative Services, Inc. (United), submitted a response to the solicitation. Although performance was to begin on October 1, 1985, and run until September 30, 1986, plaintiff was not awarded the contract (No. F19650–86–C00003) until December 18, 1985. Consequently, the term of performance was amended to run from January 1, 1986, until October 1, 1986, and provided defendant an option to renew for fiscal years 1987, 1988, and 1989.

The solicitation was issued under the Service Contract Act (SCA), 41 U.S.C. § 351–58 (1988), and incorporated a Department of Labor (DOL) wage determination establishing minimum hourly wage rates and fringe benefits for various categories of service employees. *See,* 29 C.F.R. § 4.3. The contract also contained a Performance Work Statement (PWS), which described in detail the services to be performed under the contract and established minimum qualifications for personnel under the contract.

The DOL wage determination included in this solicitation divided employees into two categories: Guard I (unarmed guard) with a minimum wage of $4.99, and Guard II (armed guard) with a minimum wage of $6.43 per hour. Plaintiff implemented the "Guard II" determination since the contract called for *armed* guard services. On January 1, 1986, a new wage determination established the hourly wage for "Guard II" at $6.69 per hour, an increase of $0.26 per hour. The new wage determination issued by DOL was incorporated as part of the contract by Modification P00002, dated January 29, 1986, and was issued pursuant to the Price Adjustment (multi-year and option contract) provision of

the contract No. DAR 7–1905(b). Modification P00002 stipulated that the price change would be made pursuant to the Price Adjustment Clause (PAC) of the contract, and would not include compensation for general and administrative costs (G & A), overhead, and profit. Because the effective date of Modification P00002 was January 1, 1986, plaintiff was required to pay employees the higher wages from the commencement of the contract. In May, 1986, the Air Force issued Modification P00004, which provided compensation for the $0.26 per hour minimum wage increase.

### A. Count I–Modification P00004

After executing Modification P00004, plaintiff received approximately $25,000 accounting for the increase in wages from $6.43 to $6.69 per hour for security officers. Plaintiff was reimbursed a $0.26 per hour increase only for those positions which plaintiff was paying less than $6.69 per hour, and, as stipulated in Modification P00002, was not compensated for lost G & A, overhead, and profit. Accordingly, defendant maintains that the modification, executed by both parties, properly reimbursed plaintiff and is an effective accord and satisfaction.

Plaintiff, however, argues that the new wage determination should have been included with the solicitation before the contract was awarded on December 18, 1985. Because the wage increase became effective at the beginning of the contract, instead of the beginning of the option year, plaintiff maintains that it is entitled to an equitable adjustment for all hours of the contract price, as well as overhead and profit, under the changes provision of the contract.

At trial, Mr. Guidice, President of United, testified that when he signed Modification P00004 and the attached release,[1] he did not "truthfully" believe that this settled all claims.[2] Instead, he contends that the agreement was entered into as a result of duress. The government, however, offered convincing evidence that the modification was a complete accord and satisfaction of the issue. Furthermore, the court is persuaded that plaintiff knowingly and without any influence or threat fully released defendant of all future claims associated with Modification P00004.

An accord is reached when one party agrees to supply or perform and the other party agrees to accept, in settlement or satisfaction of an existing claim, something other than what was actually due. *Chesapeake & Potomac Tel. Co. of Virginia v. United States,* 654 F.2d 711, 716, 228 Ct.Cl. 101 (1981). Satisfaction is the actual execution and/or performance of the agreement. *Id.* at 711.

Several elements are necessary in order to effectively execute an accord and satisfaction. There must be proper subject matter, competent parties, meeting of the minds, and consideration. *Mil–Spec Contractors, Inc. v. United States,* 835 F.2d 865, 867 (Fed.Cir.1987); *Robinson Contracting Co., Inc. v. United States,* 16 Cl.Ct. 676, 680 (1989). The absence of any of these elements results in a failure of the defense. *Westerhold v. United States,* 28 Fed.Cl. 172, 175 (1993).

Based on the testimony of both defendant's and plaintiff's witnesses, the court finds that the parties did indeed negotiate and came to a "meeting of minds" with respect to this modification. The government considered plaintiff's position, but did not agree. Mr. Guidice signed the modification, thoroughly aware that it was intended to compensate him in full for the new wage determination. That is not to say, of course, that Mr. Guidice was pleased with the final dollar amount he received. Nevertheless, if he was determined to seek further compen-

---

1. Modification P00004 contained the following release:

 In consideration of the modification agreed to herein as complete equitable adjustments for the Contractor's wage increase proposal for adjustment, resulting from wage determination number 78–246 (Rev–8) dated August 21, 1985, for New Hampshire (statewide), the Contractor hereby releases the government from any and all liability under this contract for further equitable adjustments attributable to such facts and circumstances giving rise to the proposal for adjustment.

2. Tr. 216 (20–23).

sation at another time, he should have taken some action to reserve his rights.

In general, when a parties' settlement results in a contract modification, reservations of a right or claim for damage must be manifest and explicit. *Cannon Const. Co. v. United States,* 319 F.2d 173, 162 Ct.Cl. 94, 100 (1963). There is no suggestion that plaintiff intended to reserve its rights, rather, they were explicitly released. Moreover, Mr. Guidice did not convince the court that he was threatened, or coerced into signing either the modification or the release.[3] In order to constitute legal duress: (1) one side involuntarily accepts the term of the other; (2) the circumstances permit no other alternative; and (3) the circumstances were a result of the coercive acts of the opposite party. *Fruhauf Southwest Garment Co. v. United States,* 111 F.Supp. 945, 126 Ct.Cl. 51, 62 (1953). Economic pressure and even the possibility of severe financial loss, however, are not duress. *International Tel. & Tel. Corp., etc. v. United States,* 509 F.2d 541, 206 Ct.Cl. 37, 52 (1975). Furthermore, a claim of economic duress is not substantiated by the making of hard bargain. *Aircraft Associates & Mfg. Co. v. United States,* 357 F.2d 373, 174 Ct.Cl. 886, 896 (1966). The mere stress of business conditions will not constitute duress. Instead defendant must have engaged in some wrongful conduct, or be the cause of plaintiff's plight, in order to shift responsibility for deals made by plaintiff under the stress of financial necessity. *Johnson, Drake & Piper, Inc. v. United States,* 531 F.2d 1037, 209 Ct.Cl. 313, 321 (1976); *La Crosse Garment Mfg. Co. v. United States,* 432 F.2d 1377, 193 Ct.Cl. 168, 177 (1970).

Mr. Guidice testified that he agreed to Modification P00004 as a result of financial pressure. He, however, could have alleviated United's monetary constraints without agreeing to release defendant from future claims. For instance, Mr. Guidice could have insisted on signing Modification P00004, *without* the attached release, and taken steps to reserve his rights to pursue any additional claims.

This would have guaranteed payment to United, as well as, protected its right to seek relief through the formal claim process. Mr. Guidice's testimony with respect to another modification, Modification P00008, discloses that he knew of this alternative. Mr. Guidice testified that the omission of the contractor's release on Modification P00008 was intentional; otherwise, he would have refused to sign.[4] Therefore, it is clear that Mr. Guidice knew he could receive compensation while maintaining the sanctity of any future claims. Moreover, there is no evidence that the government would not have issued Modification P00004 if Mr. Guidice took steps to preserve his rights. Thus, plaintiff's argument that the modification and the release were entered into as a result of "economic duress" is not persuasive.[5] Accord and satisfaction is a complete defense and bars the court from considering plaintiff's claim in Count I.

## B. *Count II—Modification P00008*

Plaintiff argues that Count II arises from a material defect in the solicitation. The solicitation included a Performance Work Statement (PWS) which set forth the basic requirements of the contract. Plaintiff argues that its interpretation of the PWS, which differs from the government, entitles it to an equitable adjustment. In order to fulfill the contract requirements, plaintiff believed that experience as an armed guard would be sufficient for certain positions. Defendant, however, insists that actual police service for all positions was necessary. Plaintiff contends that it underbid the contract because a person without prior police experience commands much lower wages, and, by complying with defendant's demands, additional expenses were incurred.

Before the court considers plaintiff's claim, however, it must dispose of defendant's defense that Modification P00008 was a complete accord and satisfaction of this claim. Before the parties entered into Modification P00008, plaintiff negotiated a collective bargaining agreement with the Union, and agreed to wages and fringe benefits which

---

3. Tr. 216 91–25; Tr. 521–22 (10–25, 1–3); Tr. 727 (2–15).

4. Tr. 331 (8–9); 336 (2–8).

5. Plaintiff's Post Trial Brief (Pl.Br.) at 9.

were consistent with what plaintiff considered defendant's "new" personnel requirements, i.e., police experience over armed guard experience. Defendant would not recognize the wage and benefit increases until October 1, 1987, the second option year of the contract. Apparently in June of 1987 DOL recognized that it had proposed a faulty wage determination, and adopted the wages and benefits negotiated by plaintiff and the Union, and applied them retroactively to the contract, raising the rates for employees to $8.25, $10.25, and $12.75.[6] Modification P00008 was executed in accordance with the 1987 DOL order. Defendant paid plaintiff approximately $600,000.00 for the conforming DOL action. The modification was issued under the PAC; therefore, plaintiff could not receive reimbursement for profit, G & A, and other items.

In October, 1987, defendant notified plaintiff that it was not renewing the contract for that year. Further, after defendant notified plaintiff of its intention to terminate the contract, DOL requested that plaintiff's contract payments be withheld in order to fund the retroactive wage and benefit increases. Defendant accommodated DOL's request.

Modification P00008 is not an accord and satisfaction of plaintiff's instant claim. The fact that the modification was issued pursuant to the PAC mandates that it was not meant as a reimbursement for "extra work" or a change in the contract, which would have been issued pursuant to the changes clause. Instead, the payment only signified defendant's compliance with DOL's wage and benefit increase.

■■■ There are three elements that must be present in order for there to be an effective accord and satisfaction: (1) a bona fide disputed claim between the government and the contractor; (2) an agreement to set-

tle the disputed claim in return for substituted performance; and (3) an acceptance of the substituted performance in full satisfaction of the disputed claim. *Tri-O, Inc. v. United States,* 28 Fed.Cl. 463, 470 (1993). The intention of the parties is the critical element of an accord and satisfaction. *Id.* Therefore, a settlement will not bar disputed claims which were not considered by the contractor and the government. *Id.*

■■■ Because the modification was issued under the PAC, plaintiff's initial proposal for an adjustment which included profit and G & A was rejected. Defendant told plaintiff its defective specification claim had nothing to do with Modification P00008, and it should pursue that claim separately. When issuing Modification P00008, the government did not consider whether the solicitation was flawed or whether the government "changed" the contract requirements after award, nor did plaintiff accept payment in agreement to settle that issue. Modification P00008 compensated plaintiff for DOL's wage and benefit increase and had nothing to do with changes imposed by defendant on the contract; thus, it is not an effective accord and satisfaction of the claim presented in Count II of this action.[7]

Essentially Count II involves basic contract interpretation of the PWS included with the solicitation. The PWS had various sections pertaining to personnel. Under the General–Scope of Work section the PWS set forth:[8]

1.1.3.1. Because of the nature of the security police mission, it is essential that the force acquired under the PWS be a well trained, highly motivated, professional organization.... This is not a contract for a night-watchman or minimal guard services; it is a contract for a fully trained security police force. As such it is the intent of this

---

6. Tr. 95–28 (17–25).

7. For the first time in the course of this litigation, defendant in its post trial brief, argues that Count II should be dismissed because there was no dispute. The court is perplexed at defendant's argument especially in light of the Contracting Officer's (CO) decision on October 20, 1988. Plaintiff requested a final decision on its claim that the government made changes to the securi-

ty requirements for the contract. The CO denied plaintiff's claim for constructive change in services that were performed under the contract in the amount of $494,315.67. Therefore, *clearly* the CO was previously on notice that a dispute existed. *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 878 (Fed.Cir.1991).

8. Trial Exhibit (Tr.Ex.) 2.

PWS to secure high quality services. Questions of interpretation of contract provisions should be analyzed with this statement of intent in mind. Actual police service, as in the Armed Forces of the United States or in the police force of a civilian governmental unit in the United States, is required. Service as an armed security guard is insufficient to meet the experience requirement of the PWS.

The language, however, under the section specifically dealing with Personnel, was not as clear:

The contract manager under section 1.2.1.4.1 of the contract was required to have "a minimum of ten years of security or law enforcement administration and operation experience in armed forces security police or *comparable civilian police operations.*" (emphasis added).

The Shift Supervisors under 1.2.1.5 of the contract had to have "a minimum of five years of security or law enforcement experience in the armed forces or *comparable civilian police operations.*" (emphasis added).

The Training Specialists under 1.2.1.6 of the contract had to have "at least two years experience in the preparation of training programs for military or *civilian security police forces.*" (emphasis added).

The Quality Control Specialists under 1.2.1.7 of the contract had to have "a minimum of eight years of security or law enforcement experience as an Armed Forces police officer or *comparable civilian experience.*" (emphasis added).

The Resources Protection Specialists/Investigators under 1.2.1.8 had to have "a minimum of four years experience in security and law enforcement as an Armed Forces policeman or *comparable civilian experience.*" (emphasis added).

The Security Response Team Member under 1.2.1.10 of the contract had to have "a minimum of two years experience as an Armed Forces policeman or *comparable civilian experience.*" (emphasis added).

The Security Controllers under 1.2.1.11 of the contract had to have "a minimum of three years experience as an Armed Forces policeman or *comparable civilian experience.*" (emphasis added).

The Law Enforcement Specialists had to have "a minimum of two years experience as an Armed Forces policeman or *comparable civilian experience.*" (emphasis added).

The Entry Controllers had to have "a minimum of two years experience as an Armed Forces policeman or *comparable civilian experience.*" (emphasis added).

The government insists that the "General Scope of Work" section of the PWS controls the meaning of the entire contract. Indeed this section includes the statement that "questions of interpretation should be analyzed" that "actual police service" is required. Therefore, defendant argues that, even where specific statements under the Personnel Requirements potentially conflict, plaintiff was obligated to hire someone with actual police experience. Plaintiff's president, Mr. William Guidice, however, interpreted the contract differently. He contends that based on the wage determination and the specific personnel statements set forth above, the contract required him to provide an employee force who had either prior armed forces police experience or comparable private security police experience.

■■■■ Under the standard rules of construction, the interpretation of a contract provision is a matter of law. *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384, 386 (1965); *National Rural Util. Co-op Finance Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988) aff'd, 867 F.2d 1393 (Fed.Cir. 1989). The language must be given the meaning which would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp.,* 351 F.2d 972, 169 Ct.Cl. at 388; *Truong Xuan Truc v. United States,* 212 Ct.Cl. 51, 65–66 (1976). If a contract contains general and specific provisions which are in any respect inconsistent or conflicting, the more specific provision controls. *Hol–Gar Mfg. Corp.,* 351 F.2d 972, 169 Ct.Cl. at 396.

■ This case involves a classic example of conflicting provisions in one contract. The PWS contained a "general work statement" which provided a broad explanation of the scope of work as well as a "personnel section" which set forth each employee's specific job requirements. In general the contract called for "actual police service, as in the Armed Forces of the United States or in the police force of a civilian governmental unit in the United States." The specific provisions of the contract, however, used the terminology "actual police service" only for certain positions. Other provisions in the same section merely required "comparable civilian service." The court determines that the more specific provision of the contract should control, rather than the general statement. This resolution does not render the General Statement insignificant or useless, but gives meaning to all parts of the contract. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983); *Hol–Gar Mfg.*, 351 F.2d 972, 169 Ct.Cl. at 390.

■ Even if the court assumes for the sake of argument that the government's interpretation is also reasonable, "[i]t is a generally accepted rule, which requires no citation of authority, that if a contract is reasonably susceptible of more than one interpretation, it is ambiguous." *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986). Where such a latent ambiguity exists, the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable. *Ft. Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed.Cir. 1988). This promotes care and completeness by drafters of contracts. *United States v. Turner Constr. Co.*, 819 F.2d 283, 286 (Fed. Cir.1987).

In fact, when the court questioned why the personnel provision of the PWS was not consistent, the government witness admitted that it was confusing:

Court: Why didn't this contract, this performance statement, have consistent language? Why didn't all the positions ... state the same language, i.e., the civilian police experience?"

Witness: I can't really answer that for you, your honor. The intent in writing any performance work statement is to be clear and concise and unambiguous. However, these documents are written up not always by persons with the most exquisite writing skills. I really can't tell you why they're not consistent ...

Court: Don't you find that confusing?

Witness: Yes, sir ... I think to some degree there would be an element of confusion.

This witness was exactly right, the drafters of the contract were not conscientious. Accordingly, the court will not punish the contractor for defendant's inability to produce a simple straightforward document that can clearly convey what performance is expected on the contract.

■ Defendant insists that if the contractor found this language confusing, then it had an obligation to clarify the meaning during the pre-bid survey. The court agrees, however, in this instance, plaintiff was not confused, it was misled. In determining whether the ambiguity was patent or latent, the question "is not the actual knowledge of the contractor, but the obviousness of the discrepancy [in the contract terms] which imposes the duty of inquiry." *Chris Berg, Inc., v. United States*, 455 F.2d 1037, 197 Ct.Cl. 503, 515 (1972). A patent or glaring ambiguity would impose "an affirmative duty on plaintiff to seek clarification [from the agency] prior to submitting its bid." *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 107 (1983). If plaintiff failed to clarify a patent ambiguity, then it would forfeit the opportunity to rely upon its unilateral interpretation of the contract. *Cherry Hill Sand & Gravel Co., Inc. v. United States*, 8 Cl.Ct. 757, 762 (1985); *MWK Int'l., Ltd., Inc. v. United States*, 2 Cl.Ct. 206, 210 (1983).

■ A latent ambiguity, on the other hand, "should be resolved against the party who drafted the contract." *Chris Berg*, 455 F.2d 1037, 197 Ct.Cl. at 514; *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988). This, of course, "is subject to the condition that the alternative interpretation tendered by the other party be a reasonable

one." *William F. Klingensmith, Inc. v. United States,* 505 F.2d 1257, 205 Ct.Cl. 651, 657 (1974) (per curiam). An alternative interpretation must only be reasonable with defendant "shouldering 'the major task of seeing that . . . the words of the agreement communicate the proper notions . . .'" *John C. Grimberg Co., Inc. v. United States,* 7 Cl.Ct. 452, 456 (1985) (quoting *WPC Enters., Inc. v. United States,* 323 F.2d 874, 163 Ct.Cl. 1, 6 (1963)).

■ The solicitation's ambiguity was not glaring and patent. The ambiguity was latent because the contractor's interpretation was reasonable. For instance, the contract manager was required to have ". . . experience in armed forces security police or comparable civilian *police* operations," while the Security Response Team Member was required to have ". . . experience as an Armed Forces policeman or comparable *civilian* experience." (emphasis added). The difference in these two job descriptions gave plaintiff no reason to clarify its interpretation because it was rational to infer that the contract only required "actual police service" where it was specified. Therefore, plaintiff did not have any obligation to inquire pre award. *See, e.g., Newsom v. United States,* 676 F.2d 647, 230 Ct.Cl. 301, 303 (1982). Moreover, it was not until after the award that defendant clarified its intent for this contract.

Previously the government had problems with another contractor and its work force which, for the most part, did not have actual police experience.[9] In order to prevent a similar problem, the Air Force apparently determined that plaintiff's contract would require actual police experience for all contract positions. There was, however, no amendment to the solicitation. Furthermore, the government made no attempt to specify to plaintiff that this contract would require more stringent specifications.

Plaintiff was not aware of the previous problems encountered by defendant until after the contact was awarded; nor was it aware that its contract represented a departure from the earlier contracts or that defendant intended to impose a different standard. Indeed, plaintiff's initial efforts to hire a staff clearly conveyed its interpretation of the contract requirements. Plaintiff's advertisement for employees in the local New Hampshire newspaper, solicited "Security Officers for government installation with experience in law enforcement or private security." The ad realized a large response, and Mr. Guidice gathered all the potential applicants in an auditorium on base. It was not until that time that he was informed that the applicants must have actual police experience. Mr. Guidice was quite surprised, but found he had no choice but to accede to the government's demands.[10]

Thereafter, plaintiff continued to insist that someone with actual police experience could not be hired at the wages set forth in

---

9. Tr. 380 (6–16).

10. Defendant maintains that Sgt. Farley, the "quality surveillance representative" who dealt with day-to-day maintenance of the contract, was the individual who imposed the actual police service requirement. Incredibly, defendant contends that Sgt. Farley *was not actually authorized to impose such a requirement.* Moreover, defendant asserts that if Mr. Guidice proposed individuals without police experience to Captain Dzeima or Glenn Hatton (two of over six *off-site* COs), he would not have been turned down! Aside from the problems the government experienced composing the solicitation, this contract also suffered from too many voices of authority without one voice of determination. Sgt. Farley was *on-site* to enforce the terms of the contract. If he did not have authority to impose the "actual police service" requirement, defendant presented no evidence demonstrating that Captain Dzeima or Glenn Hatton intervened to correct an erroneous interpretation. Instead, the overwhelming evidence indicates that Sgt. Farley interpreted the contract in line with the Agency's position.

Moreover, the two positions are obviously irreconcilable. The court cannot be expected to accept that both, "[United's] contention, that it could hire security guards with no police experience, is simply nonsensical and would not be derived from the contract language by a 'reasonable intelligent person acquainted with contemporary circumstances.'" *(citations omitted)* (Defendant's Post Trial Brief pp. 34–35); *but also* "it is quite likely that had UIIS [United] proposed candidates with security guard experience . . ., such candidates *would have been accepted.*" *(emphasis added)* (Defendant's Post Trial Brief p. 36). Defendant's wavering on both sides of the fence only substantiates the court's finding that plaintiff's interpretation of the contract is indeed reasonable.

the Wage Determination, as they would command much higher pay. Although plaintiff was able to man the contract, it experienced great difficulty hiring employees at these rates, and often found it troublesome retaining any of its employees. Indeed, during the contract the government considered issuing a cure notice when plaintiff's posts were not properly staffed.

 The court is convinced that the government insisted that plaintiff's employees have actual police service. Nevertheless, the court is perplexed why no one from the government made any attempt to communicate this crucial requisite to plaintiff at any one of the pre-performance meetings. As a matter of fact, even though the pre-performance checklist specifically states, "check contractor's ability to perform full security police functions, not just guard duty," no inquiry was ever made.[11] There was no discussion whatsoever regarding the contract staffing. Thus, the court determines that defendant's subjective, unexpressed intentions are not binding on plaintiff. *Singer–General Precision, Inc. v. United States,* 192 Ct.Cl. 435, 446–47, 427 F.2d 1187, 1193 (1970). The unilateral intent of one party is insufficient to bind the other, *Jefferson Constr. Co. v. United States,* 151 Ct.Cl. 75, 1960 WL 8442 (1960), especially when the latter reasonably believes otherwise. *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl.

1, 6, 323 F.2d 874, 877 (1963); *Sturm v. United States,* 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970). If defendant expected all employees to have actual police experience, it had the obligation to state that in clear and unambiguous language. *Tufano Contracting Corp. v. United States,* 174 Ct.Cl. 398, 356 F.2d 535 (1966). It did not do so in this case.[12]

In addition to issuing an ambiguous solicitation, defendant further botched this contract by allowing persons without "actual police experience" to be hired when it suited the government.[13] In September 1985, after the previous contractor walked off the job leaving many unpaid and disgruntled workers, the Air Force federalized employees who wished to remain at New Boston. As part of the contract award, plaintiff was required to give previous employees the right of first refusal, many of whom did not have actual police experience. Defendant argues that this, however, did not compel plaintiff to retain any employee without actual police service. Mr. Guidice and his employees, however, convincingly recounted examples where the Air Force might propose a person to be hired and waive the requirement, on a case-by-case basis, "especially if he was a Vietnam Veteran."[14] Mr. Guidice alleged that as much as 15% of his work force was made up of employees who were allowed to retain their posts even though they did not

---

**11.** Tr. 59 (9–15).

**12.** As previously discussed, the solicitation included a DOL wage determination setting forth the minimum wage the contractor may pay its employees on the contract. The DOL wage determination which was included in this solicitation divided employees into two categories: Guard I (unarmed guard) with a minimum wage of $4.99, and Guard II (armed guard) with a minimum wage of $6.43 per hour, which was later amended to $6.69 per hour. Plaintiff claims that if the government wanted a police force rather than a guard force, the Wage Determination included in the contract for Guard I and II was inapplicable. Testimony proffered at trial by both parties indicated that the government was also aware that the determination was erroneous. Prior to issuing the solicitation for bids, the Air Force notified DOL of its intent to seek a contract for security police services and requested a wage determination. In response the government received the determination for Guard I & II. Insisting that the contract was for

a police force rather than a guard force, the Air Force sent a second request advising DOL that it had *erroneously* supplied a determination for guards. DOL failed to alter its determination; nevertheless, the Air Force issued the solicitation with what *it* considered an incorrect wage determination. In light of this discrepancy, defendant should have made every effort to communicate to the contractor that it was looking for candidates with police, not armed guard, experience. Although it is not a contract specification, the determination could recognizably confuse a potential bidder. Therefore, the government in this case had the additional burden of clearly articulating its objective for a work force. Unfortunately, this was not accomplished by drafting a solicitation riddled with inconsistencies and taking no action to verbally or otherwise clarify the contract requirements.

**13.** Tr. 73 (1–20); 95–57 (2–21).

**14.** Tr. 104 (17–25).

have actual police experience. This course of action demonstrates to the court that the Agency, itself, did not know what it wanted on this contract.

■ Finally, defendant once again attempts to resurrect a controversy previously determined by this court in its opinion *United International Investigative Services v. United States*, 26 Cl.Ct. 892 (1992). Because the court stands by its former decision, there is no need to delve into a laborious factual recitation. Defendant argues that United did not merely change its name in the middle of the contract, but became an entirely different entity, with whom there is no privity of contract. The court is not persuaded by defendant's argument. The change of name from United Security Unlimited to United International Investigative Services had no impact on the contract. Throughout the term of the contract the government dealt with Mr. Guidice as the sole representative of the company. There was no change in the contractual relationship whatsoever as a result of the name change. Moreover, the court does not find that the name change was executed to perpetrate any fraudulent activity.

Defendant's issue with plaintiff's chapter 11 bankruptcy filing is equally unpersuasive. The fact that the government would not have contracted with plaintiff if it had known of the company's true financial position only convinces the court that the government should have done its homework *before* awarding the contract.

## C. *Damages*

In accordance with this opinion, the court determines that plaintiff has successfully proven entitlement on Count II of this action. The parties did not bifurcate the issue of liability and damages; and, therefore, sufficient proof as to the amount of damages should have been provided at trial. Defendant argues that plaintiff did not prove the $494,000 in damages alleged at trial; and, the court agrees. Plaintiff did not provide sufficient evidence that it sustained $494,000 in damages as a result of defendant's action.

■ Uncertainty as to the amount of damages does not preclude recovery where the fact of damage is clearly established. *Addison Miller, Inc. v. United States*, 70 F.Supp. 893, 899, 108 Ct.Cl. 513 (1947); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 719 (1984). The court, however, cannot indulge in pure speculation when it comes to awarding damages. Although the court finds that the PWS was materially defective, plaintiff must prove that the amount it seeks was a result of the solicitation's flaw.

■ The documents which plaintiff relies on to prove its damages merely provide final figures without any accounting or explanation. There must be some foundation or reasonable basis for ascertaining the amount of damages. *Addison Miller, Inc. v. United States*, 70 F.Supp. at 899. That information was not provided and it is impossible for the court to calculate any amount of damages from the evidence that was submitted. For the most part, the court only has Mr. Guidice's testimony with which to make a determination.

■ The court is skeptical about claims for lost profits. *See Neely v. United States*, 152 Ct.Cl. 136 (1961); *Jackson v. United States*, 12 Cl.Ct. 363 (1987). Damages for lost profits have been awarded only where definite proof is furnished showing that profits would have been realized and a basis is available for their reasonable estimation. *Id.* at 366. Plaintiff has not provided sufficient proof for the court to award any amount in lost profits. Therefore, the court will not grant plaintiff's request for lost profits.

The court, however, will provide 45 days for the parties to determine a reasonable recovery for increases in G & A and overhead costs.[15] *See Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539, 553 (1984) (reinstating pretrial proceedings in order to resolve the amount of recoverable damages). In order to recover G & A and overhead

---

**15.** The court has reviewed Mr. Guidice's tax record and is satisfied that all but $11,896.17 has been paid of the $91,074.99 debt to the Internal Revenue Service (IRS). Mr. Guidice has provided the court with evidence that the IRS issued a certificate of Release of Federal Tax Lien on June 8, 1988, but it does not necessarily indicate that it applies to the debt in question.

costs, plaintiff must show that the increase in these costs was a direct result of the stricter security requirement. Further, it must supply a full accounting and logical computation of the final figure, as well as payroll records showing that expenses were actually incurred and disbursed.

### Conclusion

In accordance with the opinion stated above, the court finds that the parties executed an effective accord and satisfaction with respect to the claim presented in Count I. Accordingly, Count I is dismissed. In Count II, however, the court holds that there was no accord and satisfaction and that the solicitation issued by defendant was materially defective. Therefore, defendant is liable to plaintiff for any resulting damages. Although plaintiff did not meet its burden of proving damages at trial, the court will allow the parties 45 days in order to determine the reasonable amount of damages which were incurred as a result of the solicitation's defect. The parties are directed to file a determination as to the amount of damages by May 18, 1995, and the Clerk is directed to enter judgment at that time without further order of this court. No costs.

IT IS SO ORDERED.