UNITED INTERNATIONAL INVESTIGATIVE SERVICES, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant/Cross–Appellant.

Nos. 96–5023, 96–5034.

United States Court of Appeals, Federal Circuit.

March 18, 1997.

Robert E. Deso, Deso, Thomas, Spevack, Weitzman & Rost, P.C., Washington, D.C., argued for plaintiff-appellant.

Steven E. Gordon, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for defendant/cross-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Anthony H. Anikeeff and

Jeanne E. Davidson, Assistant Directors. Of counsel on the brief were LTC Richard Prins, Department of the Air Force, Arlington, Virginia. Of counsel was Major H. Josseph Batey, Department of the Air Force.

Before MAYER, SCHALL, and BRYSON, Circuit Judges.

MAYER, Circuit Judge.

United International Investigative Services appeals the judgment of the United States Court of Federal Claims, holding the United States liable for a material defect in a contract for security services at an Air Force base, 33 Fed. Cl. 363 (1995), but awarding no damages. The United States cross-appeals, arguing that it was not liable because the contract was not defective. Because the court misconstrued the contract, we reverse.

*Background*

On August 16, 1985, the United States Air Force solicited bids for a contract to provide security services at New Boston Air Force Tracking Station in Amherst, New Hampshire. The solicitation required services for a base year, October 1, 1985 through September 30, 1986, and granted the Air Force options to renew the contract for three additional years.

In accordance with the Service Contract Act, 41 U.S.C. §§ 351–358 (1994), the Air Force submitted a Standard Form (SF) 98 to the Department of Labor (DOL) in March 1985, requesting a wage rate determination establishing the minimum hourly wages and benefits for this contract. DOL issued the Air Force a wage rate determination that divided employees into two categories: Guard I (unarmed guard) with a minimum hourly wage of $4.99, and Guard II (armed guard) with a minimum hourly wage of $6.43. The Air Force submitted a new SF 98, explaining that the "[c]ontemplated contract is for a Police Service not a Guard Service. Therefore, wage rates should be for police service not guard service...." The Air Force received the same wage rate determination, which it then included in the solicitation.

The solicitation also included a "Performance Work Statement" (PWS), the first two sections of which addressed the contract's "Scope of Work" and "Personnel" requirements, respectively. The PWS described the "Scope of Work" as follows:

> Because of the nature of the security police mission, it is essential that the force acquired under this PWS be a well trained, highly motivated, professional organization.... This is not a contract for night-watchmen or minimal guard services; it is a contract for a fully trained security police force. As such, it is the intent of this PWS to secure high quality services. *Questions of interpretation of contract provisions should be analyzed with this statement of intent in mind. Actual police service,* as in the Armed Forces of the United States or in the police force of a civilian governmental unit in the United States, *is required. Service as an armed security guard is insufficient* to meet the experience requirement of the PWS. [Emphasis added].

The "experience requirement[s] of the PWS" were set forth in the succeeding section, entitled "Personnel," as shown in the following table:

| POSITION | EXPERIENCE REQUIREMENT |
| --- | --- |
| Contract Manager | "a minimum of ten years of security or law enforcement administration and operation experience in armed forces security police or comparable civilian police operations" |
| Shift Supervisor | "a minimum of five years of security or law enforcement experience in the armed forces or comparable civilian police operations" |
| Training Specialist | "at least two years experience in the preparation of training programs for military or civilian security police forces" |
| Quality Control Specialist | "a minimum of eight years of security or law enforcement experience as an Armed Forces police officer or comparable civilian experience" |
| Investigator | "a minimum of four years experience in security and law enforcement as an |

| POSITION | EXPERIENCE REQUIREMENT |
| --- | --- |
| | Armed Forces policeman or comparable civilian experience" |
| Response Team Member | "a minimum of two years experience as an Armed Forces policeman or comparable civilian experience" |
| Security Controller | "a minimum of three years experience as an Armed Forces policeman or comparable civilian experience" |
| Law Enforcement Specialist | "a minimum of two years experience as an Armed Forces policeman or comparable civilian experience" |
| Entry Controller | "a minimum of two years experience as an Armed Forces policeman or comparable civilian experience" |

On December 18, 1985, the Air Force awarded a firm, fixed-price contract to United Security Unlimited, Inc., which subsequently changed its name to United International Investigative Services (United). As amended, the contract's base performance period was from January 1, 1986, until October 1, 1986, and the government had options to renew the contract for fiscal years 1987, 1988, and 1989.

By letter dated January 27, 1986, United informed the contracting officer that it "[had been] brought to [United's] attention that all personnel on this contract had to have two (2) years as a police officer to be employed on this contract." United stated that the contract required two years of experience as a police officer or "comparable civilian experience," which it believed was satisfied by experience as "a Security Officer not a Police Officer." The letter closed by suggesting that if actual police experience was required, the wage rate determination had to "be conformed to reflect the proper job description and pay wages."

In February 1987, DOL informed United that it had been underpaying its employees on this contract since its inception, and instructed United to "increase the wage rate for each category of employee retroactive to the start of the contract." United then wrote to the contracting officer explaining that DOL's requested action would result in an

unrecoverable loss. It asked that "the contract be modified to conform" to the wage rates contained in a recently-negotiated collective bargaining agreement.

The contracting officer forwarded United's request to DOL and recommended that DOL issue a conforming wage rate determination consistent with the rates in United's request. DOL adopted the contracting officer's recommendation, stating that the new wage rates were effective "retroactive to the commencement date of the contract." On August 21, 1987, the parties finished negotiating, but did not execute, a contract modification of approximately $600,000 to compensate United for the retroactive wage increase. This amount did not reflect any increase for profit and overhead costs because the parties disagreed on whether United was entitled to them.

On the same day, DOL informed the Air Force that it wanted a levy on all funds due United to ensure that the employees were paid. Soon thereafter, the Air Force told United that it would not be exercising the final two option years of the contract. In November 1987, the parties executed the contract modification they had previously negotiated. Approximately $300,000 was paid to United and the remainder was paid to DOL for wages and benefits owed to United's employees.

United then submitted a certified claim to the Air Force, seeking, among other things, an additional $494,315.67.* The contracting officer denied the claim, and United filed suit in the Court of Federal Claims. The court interpreted United's claim as seeking reimbursement for additional expenses incurred because of a material defect in the contract. It held that the PWS contained conflicting provisions: the "Scope of Work" section, which required "actual police service" experience; and the "Personnel" section, which permitted "comparable civilian service." 33 Fed. Cl. at 370. Because the latter section more specifically addressed the contract's experience requirements, it controlled over the

former section. *Id.* The court held further that even assuming these provisions rendered the contract ambiguous, the ambiguity was latent "because the contractor's interpretation was reasonable." *Id.* at 371. As such, it construed the ambiguity against the government, as the drafter of the contract. However, the court held that United had failed to prove that it suffered any resulting damages. *Id.* at 373. After affording the company three opportunities to establish damages, the court entered judgment for United, but awarded no damages. United appeals the damages finding and the government cross-appeals the conclusion on entitlement.

## Discussion

■ This case requires us to determine whether the contract between United and the Air Force was latently ambiguous or contained conflicting terms. These are issues of contract interpretation, over which we exercise plenary review. *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1576 (Fed.Cir. 1996). In construing a contract, we begin with its plain language. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). We must interpret it as a whole and "in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *Granite Constr. Co. v. United States,* 962 F.2d 998, 1003 (Fed.Cir.1992); *see also McAbee Constr.,* 97 F.3d at 1435. Thus, if the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993).

The government argues that the trial court erred in holding that the contract was materially defective, for several reasons: (1) the experience requirements were not susceptible of two different reasonable interpretations; (2) the court's construction rendered the "Scope of Work" provision superfluous and ignored the maxim that contract provisions should not be interpreted as conflicting

---

\* United's claim appears to be based on at least one of two theories: (1) that it was still owed profit, insurance, and general and administrative expenses associated with DOL's wage adjustments; (2) that it was owed money because the government purportedly changed the experience requirement for the security guards.

with each other unless no other reasonable interpretation is possible; and (3) to the extent the contract was ambiguous, it was patently so. We agree with all of these contentions.

█ The Scope of Work stated in clear and unambiguous terms that "actual police service" was required. It defined that phrase to mean service "in the Armed Forces of the United States or in the police force of a civilian governmental unit in the United States." In an abundance of caution, the Scope of Work explained further that "service as an armed security guard is insufficient to meet the experience requirement of the PWS." Potential bidders were instructed to interpret the solicitation's provisions with these requirements in mind. It is difficult to imagine a clearer statement, and we commend the drafters for including it. But for DOL's unexplained failure to properly set wage rates, there could have been no question about what was required.

█ In the succeeding section, entitled "Personnel," the specific experience requirements were stated for each of the personnel classifications. Each requirement identified the experience needed in terms of years. The contract allowed the experience requirements for six of the positions to be satisfied either by service in the armed forces police or by "comparable civilian experience." This language neither conflicts with the actual police service requirement of the "Scope of Work" nor permits United's construction, which allows for service as a security guard to satisfy the experience requirements. Rather, interpreting the experience requirements of the "Personnel" section in light of the "Scope of Work," as the contract instructs, "comparable civilian experience" simply means actual civilian police experience. To interpret the agreement otherwise would needlessly create a conflict between the "Scope of Work" and "Personnel" sections and render some provisions of the "Scope of Work" meaningless.

United points to DOL's wage rate determination in support of its construction of the contractual experience requirements. That determination, which was part of the solicitation and contract, sets out two wage rate classifications, each entitled "Guard," as opposed to police. Of course, DOL issued that determination even after the Air Force had twice notified it that the contract was for police not guard services. Viewed in isolation, this provision might lend some support to United's position. But again, the "Scope of Work" expressly stated that prospective bidders should interpret the other provisions in light of the requirement for actual police experience, and that experience as an armed security guard is insufficient. Viewing the wage rate determination in this light should have disabused United of its reading of the contract.

█ To the extent that the contract might be perceived as ambiguous, the ambiguity was patent. The trial court's view that the "ambiguity was latent *because* the contractor's interpretation was reasonable," 33 Fed. Cl. at 371 (emphasis added), is inaccurate. A reasonable interpretation only establishes the existence of an ambiguity if the government's construction was also reasonable. It is wholly unrelated to whether the ambiguity was patent or latent, which turns on whether it was glaring or not. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed. Cir.1996). United's interpretation that the experience requirements could be satisfied by service as a security guard conflicted facially with the "Scope of Work" provision to the contrary. Thus, it was required to seek clarification before bidding. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1306 (Fed.Cir. 1996). Because it failed to do so, it is not entitled to rely upon its construction of the contract. *Id.*

### Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is reversed.

*REVERSED.*