MASSACHUSETTS BAY TRANS-
PORTATION AUTHORITY,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 96–5128.

United States Court of Appeals,
Federal Circuit.

Decided Nov. 3, 1997.

Rudolph F. Pierce, Goulston & Storrs, of Boston, MA, argued for plaintiff-appellant. With him on the brief was William A. Horne.

Agnes M. Brown, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief was Gareth Rosenau, Federal Railroad Administration, of Washington, DC.

Before RICH, NEWMAN and CLEVENGER, Circuit Judges.

NEWMAN, Circuit Judge.

In this dispute arising from the renovation of Boston's South Station, the Massachusetts Bay Transportation Authority ("MBTA") appeals the grants of summary judgment by the Court of Federal Claims,[1] ruling that MBTA has no entitlement to recover against the United States for any breaches of contract that may have occurred. The Court of Federal Claims held that a warranty disclaimer provision in the contract between MBTA and the Federal Railroad Administration ("FRA") was superior to other remedial provisions, and shielded FRA from the consequences of breach of other provisions of the contract. We conclude that this interpretation of the contract is not correct. The grant of summary judgment on this issue is reversed. We remand for further determination of whether breach of contract in fact occurred and, if so, the assessment of appropriate damages. We also reverse the grant of summary judgment with respect to the Headhouse floors; the issue requires trial. Finally, we conclude that MBTA is a qualified entity for prejudgment interest under the Intergovernmental Cooperation Act.

## BACKGROUND

Pursuant to the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801 et seq., FRA was charged with implementing the Northeast Corridor Improvement Project for passenger rail service and stations from Washington, D.C. to Boston. Included was renovation of Boston's South Station, owned by MBTA. FRA retained the firm of DeLeuw, Cather/Parsons ("DeLeuw") in 1976 to be the prime architect-engineer for design of the project. The contract between DeLeuw and FRA, as well as the contracts between DeLeuw and various subcontractor architects, engineers, and design professionals, provided that these contracts were with and for "the sole benefit of the United States and [DeLeuw]" and that the local station owners were not third-party beneficiaries thereof.

In 1980 FRA and MBTA entered into the Boston South Station Improvement Project Design Agreement ("the Design Agree-

---

1. *Massachusetts Bay Transp. Auth. v. United States*, No. 283–89C (Fed. Cl. July 19, 1996 and Aug. 7, 1996).

ment"). FRA agreed to procure and supply designs for the construction of platforms and tracks, renovation of the station house, construction of additions to the station house, and correction of building code deficiencies. MBTA was allowed "input" and direct communication with the designers, who were instructed to accommodate MBTA for improvements fully funded by MBTA. Although the parties dispute the extent of MBTA's design authority, the Design Agreement at § 3(n) provides that "[t]he parties shall use their best efforts to approve the final design documents" and "[a]greement on final design shall be evidenced by an exchange of letters between [MBTA] and [FRA]."

In 1983 FRA and MBTA entered into the Boston South Station Transportation Center Project Cooperative Construction Agreement ("the Construction Agreement"). The Construction Agreement explained the cost distribution in its Agreement Summary:

> FRA will bear 100 percent of the costs of the "operational" improvements (those primarily benefitting Amtrak service) and 50 percent of the costs of the "cost-shared" improvements (rail-related improvements not primarily benefitting Amtrak). MBTA will bear the other 50 percent of the costs of the cost-shared improvements, as well as 100 percent of the costs of certain "local" improvements.

The Construction Agreement set in motion construction at South Station according to the designs procured by FRA under the Design Agreement. The agreement provided that MBTA could not deviate from the design documents without first obtaining permission from FRA. Thus FRA bore responsibility for design of the project while MBTA bore responsibility for implementing its construction.

The Construction Agreement contained several provisions directed to potential liability issues. Section 220(a) gave FRA the authority to approve or reject settlements of contractor claims proposed by MBTA, which approval could not be unreasonably withheld by FRA. In § 220(b) the Agreement required that either FRA or MBTA would pay contractor claims, depending on the aspect of the construction to which the claim pertained:

> § 220(b). The settlement costs of contractor claims caused by circumstances outside the parties' reasonable control shall be considered Project costs. Contractor claims costs caused by the action of a party shall be borne exclusively by that party, by being made accountable to the Operational Improvements, if FRA is the party, or to the Local Improvements, if MBTA is the party.

The Construction Agreement contemplated possible defective designs and specifications, and obligated FRA to seek compensation from the architect-engineers for design defects:

> § 220(c). FRA shall pursue with its design-phase A–E all contractual rights concerning correction of errors, omissions, and deficiencies.

FRA disclaimed any warranty to MBTA concerning the plans and specifications procured by FRA from the architect-engineers:

> § 222(a). Title to the Project Design Documents shall pass to MBTA upon acceptance by MBTA. MBTA acknowledges that the Project Design Documents are being prepared by an A–E acting as a contractor to FRA, not as FRA's agent. FRA makes no warranties, express or implied, concerning the Project Design Documents. No FRA or MBTA approval given under this Agreement shall be construed as a warranty of any kind.

The Construction Agreement required FRA to obtain insurance endorsements from the architect-engineers for the benefit of MBTA:

> § 222(c). FRA shall secure from each of its consultant architect-engineers ("A/E's") an endorsement to the benefit of the MBTA on the professional liability insurance policy or policies carried by such A/E's with respect to any A/E errors, omissions, or acts of negligence in the design of the Facility. FRA shall furnish the MBTA evidence of such endorsements.

In accordance with the Construction Agreement, MBTA solicited bids for construction of the South Station project. The contract was awarded to J.F. White Con-

struction Company ("J.F.White") on its bid of $48.775 million. During the course of construction J.F. White informed MBTA that the design plans contained several serious defects. The project was completed 956 days late at a cost of approximately $69 million. J.F. White submitted a claim to MBTA for increased costs of $23,680,228 that J.F. White asserted were caused by delay and loss of productivity due to the design defects. MBTA conducted an extensive study, and concluded that "design error, omissions and deficiencies were largely responsible for delays and disruptions experienced by J.F. White."

To resolve various issues of liability and responsibility, MBTA brought a declaratory action against J.F. White in Massachusetts Superior Court, also asserting claims against the architect-engineers and design professionals and against Amtrak, Boston Edison Company, and the Northeast Railroad Construction Company. The Massachusetts suit was settled for $3,810,000, wherein MBTA paid J.F. White $1.9 million, the design professionals paid J.F. White $1.8 million, Amtrak and Boston Edison paid the remaining $110,000, and MBTA released its claims against J.F. White and its direct claims against the architect-engineers and design professionals. FRA encouraged the settlement and for this purpose entered into mutual releases with the architect-engineers and design professionals.

Meanwhile, MBTA brought this suit against FRA in the Court of Federal Claims, alleging that FRA breached the Construction Agreement by (1) failing to secure insurance endorsements from the architect-engineers to the benefit of MBTA as required by § 222(c), (2) failing to pay contractor claims as required by § 220(a) and § 220(b), (3) failing to pursue its contractual rights against the architect-engineers for the correction of design errors as required by § 220(c), and (4) failing to pay for the replacement of the wooden Headhouse floors as required by the cost allocation provisions of the Design Agreement. The case was stayed pending resolution of the Massachusetts litigation.

Following the settlement of the Massachusetts case, the Court of Federal Claims lifted the stay. The court then granted FRA's motions for summary judgment, based primarily on contract interpretation. The court ruled that the § 222(a) warranty disclaimer of the Construction Agreement overrode the § 222(c) provision that FRA would secure insurance endorsements for the benefit of MBTA. The court held that the warranty disclaimer shielded FRA from all liability for damages due to design error, even if FRA had breached § 222(c) or other contract provisions relating to the design, and that this foreclosed all of MBTA's claims.

Relying on the warranty disclaimer provision, the Court of Federal Claims also held that MBTA could not recover the cost of settling the J.F. White delay claim, or the amount of MBTA's released claims against J.F. White, or MBTA's attorney fees and litigation expenses. The court held that delay damages and other damages associated with design errors were "too remote, speculative, and consequential to be compensable as damages."

The court also held that the warranty disclaimer barred MBTA's claims based on breach of § 220(c), concerning FRA's obligation to pursue contractual remedies with its architect-engineers. The court held that MBTA could not prevail on any claim based on breach by FRA of the Construction Agreement, including claims due to errors in the design of the terrazzo floor at South Station. The court also held that MBTA had agreed by Change Order to a cost sharing formula for replacement of the Headhouse floors, and could not seek further reimbursement under the Construction Agreement. The summary judgments mooted several subsidiary and dependent issues. This appeal followed.

### DISCUSSION

■■ Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). We review the grant of summary

judgment for correctness, determining whether the matter was amenable to summary resolution and, if so, whether the law was correctly applied to undisputed facts. *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1541–42 (Fed.Cir.1993). Questions of contract interpretation are subject to plenary review on appeal. *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1576 (Fed.Cir. 1996).

### A. The Warranty Disclaimer

■ Of dominant effect is the holding of the Court of Federal Claims that the warranty disclaimer provision of § 222(a) overrides all of the provisions of the contract under which FRA could be liable for damages or responsible for costs resulting from design errors, omissions, or negligence. The court held that § 222(a) is a broad provision that "expressly put plaintiff on notice that FRA would *not* be responsible for design errors" (emphasis in original).

■ MBTA states that this ruling contravenes the harmony of all of the provisions of the Construction Agreement. MBTA states that the provisions are not in conflict, but are an interrelated formula representing mutual interest as to how various risks would be allocated. We agree. It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions. *United Int'l Investigative Services v. United States,* 109 F.3d 734, 737 (Fed.Cir.1997); *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). No contract provision can be ignored.

For example, while § 222(a) barred MBTA from recourse against FRA for breach of warranty against design flaws, by § 222(c) FRA agreed to provide MBTA with insurance protection from claims due to design error, omissions, or negligence on the part of the architect-engineers. Sections 222(a) and (c), taken together, served both FRA's purpose in removing itself as guarantor of the design, and MBTA's purpose by assuring it insurance protection by endorsement from those directly responsible for the design.

The ruling of the Court of Federal Claims that the § 222(a) warranty disclaimer shields FRA from liability for damages flowing from breach of any other provision of the Construction Agreement can not stand, and is reversed.

### B. The Insurance Endorsements

■ Section 222(c) required FRA to secure insurance endorsements from its architect-engineers "with respect to any A/E errors, omissions or acts of negligence in the design of the Facility." MBTA had no responsibility for the work of these architect-engineers or their design of the facility.

It is undisputed that FRA did not secure the insurance endorsements required by § 222(c). FRA argues that even if it breached § 222(c) it incurred no liability because it contracted in § 222(c) to provide the insurance endorsements to MBTA not in order to insure MBTA against design errors by the architect-engineers providing the endorsements, but to cover any design errors of MBTA in MBTA's own capacity as an architect-engineer. The trial court agreed with this reasoning. The court held that MBTA could not recover damages for FRA's breach of its obligation to obtain the insurance endorsements in accordance with § 222(c).

■ We discern no support, in either the contract or the surrounding circumstances, for this strained reading of § 222(c). A contract is deemed to have been written so that all parts "make sense," and it is so construed when conflicting interpretations are offered after dispute arises. *Hughes Communications Galaxy, Inc. v. United States,* 998 F.2d 953, 958 (Fed.Cir.1993). It does not make sense to read this provision contrary to its plain statement of securing for MBTA insurance for design defects, from the insurers of those responsible for the design. In contrast, MBTA had neither design responsibility nor design authority. It does not make sense to read § 222(c) to provide insurance endorsements to MBTA to cover MBTA's design errors made in its capacity as an architect-engineer.

By § 222(c) FRA was obligated to secure for MBTA this insurance safeguard against liability in the event of claims due to design errors, omissions, or acts of negligence by DeLeuw and its subcontractors. FRA did not do so, thereby breaching its contractual obligation to MBTA. Section 222(a) does not shield FRA from the consequences of this breach. MBTA's claim against FRA is not based on any warranty by FRA of the design, but on FRA's admitted failure to obtain the insurance endorsements that it agreed to obtain. The government does not dispute that MBTA "demanded" this safeguard against design errors, omissions, or negligence on the part of the architects-engineers, over whose product MBTA had no control. This undertaking to obtain insurance endorsements was part of FRA's contractual agreement with MBTA.

■ The Court of Federal Claims also held that the federal government could not be liable for design errors because of the Anti–Deficiency Act, 31 U.S.C. § 1341. No authority supports the theory that the government is not liable for breach of its contractual undertakings. *See United States v. Winstar,* —— U.S. ——, —— - ——, 116 S.Ct. 2432, 2459–60, 135 L.Ed.2d 964 (1996) (recognizing governmental liability for breach of its contracts). Although the court cited *Office of Personnel Management v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473–74, 110 L.Ed.2d 387 (1990) to support its ruling, that case simply held that erroneous advice given by a government employee to a benefits claimant does not estop the government from denying benefits that are not permitted by law; it is irrelevant to the liability of the United States for breach of a contract to which it is a party. *Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed.Cir. 1995).

■ FRA argues that MBTA should have procured design error insurance for itself, when FRA failed to do so. MBTA states that the "known loss doctrine" prohibited it from obtaining such insurance because by the time it learned of the need—by learning of FRA's failure to obtain the endorsements required by § 222(c)—there had already been a specific loss. FRA also argues that

MBTA should have directly negotiated for and obtained indemnification and hold-harmless agreements with the architect-engineers. MBTA again responds that by the time it knew it might need such protection because of FRA's lapse, the harm had already occurred. We agree that these arguments do not relieve FRA of its contractual obligation, or of liability for its breach of that obligation.

The grant of partial summary judgment in favor of the government on this issue is reversed. FRA breached its obligation under § 222(c), and is liable for damages.

■ The parties disputed the appropriate measure of damages for breach of § 222(c), and the Court of Federal Claims ruled on some aspects of the damages issue. The general rule is that damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation. *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1021–22 (Fed.Cir. 1996); *Estate of Berg v. United States,* 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982); *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 713 (1975). MBTA states that these damages include the amount MBTA paid to settle the J.F. White delay claim, plus the expenses of the Massachusetts litigation including attorney fees. We agree with MBTA that these expenditures are not "too remote, speculative or consequential" to be compensable, and that the Court of Federal Claims erred in so treating them.

■ In view of its holding that such damages were not compensable, the Court of Federal Claims did not decide the extent to which the Massachusetts litigation settlement, including litigation expenses, would have been covered by the insurance endorsements. However, in accordance with the general rule in connection with breach of an agreement to insure, if these items would have been covered or MBTA relieved thereof under the insurance endorsements, then MBTA is entitled to recover the amounts thereof as compensatory damages for FRA's breach of the § 222(c) obligation. "Where a party breaches an agreement to obtain insur-

ance, the breaching party is liable for the full amount of the damages sustained." *Borough of Wilkinsburg v. Trumbull–Denton Joint Venture,* 390 Pa.Super. 580, 583, 568 A.2d 1325, 1326, *appeal denied,* 526 Pa. 626, 584 A.2d 310 (1990); *see, e.g., Cone Bros. Contracting Co. v. Ashland–Warren, Inc.,* 458 So.2d 851 (Fla.App.1984), *appeal denied,* 464 So.2d 554 (Fla.1985) (awarding damages and fees incurred from breach of agreement to insure); *PPG Industries, Inc. v. Continental Heller Corp.,* 124 Ariz. 216, 222, 603 P.2d 108, 114 (1979) (damages for breach of contract to obtain insurance include "all damages which should have been within the contemplation of the parties when the contract was made," including "costs of defending their suits, including attorneys' fees ....") (internal citations omitted).

 FRA argues that MBTA's claim to include attorney fees and consultant expenses as damages for breach of § 222(c) is barred because no statute has waived sovereign immunity for such recovery, citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) .for the proposition that attorney fees are not recoverable in an action against the United States unless expressly provided for by Congress. However, the recovery sought by MBTA is not for attorney fees in an action against the United States, but for damages for breach of a contract to obtain insurance. The damages are measured by the benefit MBTA would have received had FRA not breached its obligation under § 222(c), not the cost of MBTA's action against the United States. Thus damages would include the Massachusetts litigation and settlement expenditures to the extent that they would have been covered by the insurance endorsements and thus would not have been incurred by MBTA.

FRA argues the factual specifics of the damages issues. However, the relevant facts were not developed before the Court of Federal Claims. Having reversed the summary judgment barring any recovery for the breach of § 222(c), we remand for determination of the consequences of that breach and assessment of damages as may be appropriate.

### C. Allocation of Contractor Claims

MBTA seeks to enforce the terms of § 220(b), which relates to certain settlement costs and also assigns liability for contractor claims depending on which party's action resulted in the cost. For the reasons we have discussed, the Court of Federal Claims erred in holding that the design warranty disclaimer of § 222(a) "trumped" or negated § 220(b). Section 220(b) relates to the allocation of costs of contractor claims, a different topic from the design warranty disclaimer of § 222(a), and can not be read out of the contract. *See McAbee,* 97 F.3d at 1435 (a contract must be interpreted "in a manner that gives meaning to all of its provisions"); *United Int'l Investigative Servs.,* 109 F.3d at 737. The parties' carefully constructed system for allocating liability must be respected and implemented as to all of the provisions of the contract.

In view of its holding, the trial court did not decide whether the J.F. White settlement is within those contemplated by § 220(b), and the consequences thereof. In view of our holding that § 222(a) does not bar application of § 220(b) in accordance with its terms, we remand for application of § 220(b) to the J.F. White settlement and any other relevant aspects, and for such financial adjustment as may be appropriate to the circumstances.

### D. The Terrazzo Floors

 MBTA seeks to recover damages for FRA's failure to comply with § 220(c), which required FRA to "pursue" with its architect-engineers "all contractual rights concerning correction of errors, omissions, and deficiencies." It was conceded that design error caused at least part of the extensive cracking of South Station's newly installed terrazzo floors. Although FRA disclaimed design warranty in § 222(a), it agreed in § 220(c) to assert its contractual rights against the architect-engineers. FRA concedes that it did not do so, at least in connection with the terrazzo floor design.

The Court of Federal Claims, again viewing the warranty disclaimer as overriding all other provisions relating to design liability or

remedy, held that " § 222(a) also bars claims for damages caused by designer error that are based on plaintiff's reading of § 220(c)." This continued the court's incorrect interpretation of the Construction Agreement, for although the warranty disclaimer relieved FRA as guarantor of the design, it did not relieve FRA of its undertakings in other contract provisions. As we have discussed, the warranty disclaimer in § 222(a) is comprehensible only in the context of the alternative protections provided to MBTA in the other contract clauses. Section 220(c), which required FRA to pursue its rights concerning design errors, is in full harmony with § 222(a). Section 220(c) recognized that although MBTA had no contractual relationship with the design phase architect-engineers, FRA was party to that contract and thereby had certain contractual rights. Section 222(a) does not bar MBTA from recovering damages for FRA's breach of § 220(c).

FRA argues that § 220(c) "was not intended to provide a remedy to MBTA, but was merely a statement of how the CCA [Construction Agreement] was to be implemented." We can not agree that § 220(c), obligating FRA to pursue certain rights for the express benefit of MBTA, is meaningless. This obligation was explicit, was included in the contract between FRA and MBTA, and was part of the overall contractual arrangement. It was an undertaking by FRA, with which it did not comply. The summary judgment on this issue is reversed. MBTA is entitled to damages for FRA's breach of § 220(c).

MBTA claims the $2,063,000 that it incurred for replacement of the faulty floors. FRA states that the floors could have been patched at lower cost, and did not require replacement. FRA also points out that MBTA's engineering consultant attributed the flaws in the floor partly to the construction contractor and partly to the architect-engineers. The Court of Federal Claims did not find the relevant facts needed to determine the effect of FRA's breach of § 220(c) on recovery by MBTA of the cost of the terrazzo floor replacement. We remand for further proceedings in resolution of this claim.

### E. The Headhouse Floors

MBTA seeks to recover from FRA at least half of the cost of replacing the Headhouse floors at South Station. The Court of Federal Claims granted summary judgment denying the claim.

The South Station renovation, as originally designed, did not include replacement of the Headhouse floors, for the extent of their deterioration had not been recognized. During the construction it was ascertained that the floors required replacement, for more than thirty percent of the wooden floors suffered from dry rot and deterioration, and the floors did not meet the loading requirements of the Massachusetts Building Code. MBTA states that in accordance with § 2.2.1h of Exhibit 1 of the Design Agreement, FRA agreed to correct all code deficiencies and safety hazards involving the Headhouse floors:

2.2 *100 Percent Federally–Funded Improvements*

2.2.1 *Operational and Safety–Related Improvements*

\* \* \* \* \*, \*

h. Correct code deficiencies and safety hazards including reconstruction of fire egress, detection and protection systems. This includes any necessary work on floors 3, 4, and 5 of the headhouse.

Replacement of the floors had not been originally included in the J.F. White contract, and MBTA and FRA initiated this activity by recording their positions on contract change order forms. Change Order Request 47, dated September 3, 1985, was presented jointly by James Wright of MBTA and Charles Middlebrook of FRA. Change Order Request 47 proposed replacing the wooden floors with concrete, with the $3,100,000 cost to be shared equally between MBTA and FRA. Mr. Middlebrook wrote "Scope–OK. Funding–Pending further justification by MBTA + review by FRA."

FRA did not accept this change order request. Facing time pressures, in November 1985 MBTA, acting through its Board of Directors, issued a unilateral change order to J.F. White authorizing replacement of the

Headhouse floors. FRA continued to refuse to share the cost of any part of this work. The dispute continued and, after an exchange of many letters, on December 12, 1986 Arrigo Mongini, FRA's Acting Administrator for Passenger and Freight Services, explained FRA's position as follows:

> [T]here is no question that the FRA is responsible for 10,100 square feet of concrete floor in the CETC [Centralized Electrification and Traffic Control facilities of Amtrak] area on the 5th floor in the east wing. We will thus be responsible for about 14% of the final negotiated floor cost based on the total floor area of 70,600 square feet.

> The remaining floor space on the 2nd, 3rd, 4th and 5th floors have been identified by the MBTA since the beginning of the South Station Project as revenue producing non-rail related space. We therefore left it up to the MBTA to determine what, if anything, to do with the floors and utilities in that space.

■ The dispute continued, MBTA relying on FRA's agreement concerning the Headhouse floors, quoted *supra*, where § 2.2.1h expressly mentioned code deficiencies and safety hazards on Headhouse floors 3, 4, and 5. On July 2, 1987 Francis Keville, MBTA's Director of Construction, wrote to Mr. Mongini concerning this and several other items, and on July 9, 1987[2] Mr. Mongini replied:

> I am afraid we have not reached agreement on issue 7, replacement of wooden floors. Without reiterating our earlier arguments, documented in my December 12, 1986 letter (enclosed), I am willing to agree to have FRA pay 14 percent rather than 42 percent of the cost and to incorporate that figure in our memorandum of understanding. As an alternative, I am also willing to leave the issue unsettled, for

the purpose of signing the amendment [to the Construction Agreement].

More than a year later, on September 14, 1988 MBTA and FRA executed a modified Change Order 47 which stated, in tabular form, that FRA would pay $434,000 and MBTA would pay $2,666,000 for replacement of the Headhouse floors.

The Court of Federal Claims, granting the government's motion for summary judgment, held that MBTA's claim was "barred because plaintiff signed change orders in which it agreed to pay the costs claimed." MBTA states that Change Order 47 was not a final agreement of the disputed funding for the Headhouse floors, that the change order was not an accord and satisfaction of this issue. MBTA states that FRA had always agreed to pay 14% of the cost, and that the only purpose of Change Order 47 was to allow MBTA to obtain the agreed 14% at the time, while continuing to discuss and if necessary litigate the issue. MBTA points out that the change order does not say that the dispute was settled, and that there is no integration clause or any other indicium of final resolution of the disputed issue.

■ FRA is correct that the change order states what both sides would pay the contractor, and it appears that they did so. But change orders are not a usual form of dispute resolution not involving the contractor. The change order does not refer to any dispute, or its settlement. The amount at stake and the duration of the debate are relevant to understanding what the parties intended at the time, in view of the absence of any statement that the dispute has been finally resolved. The change order simply lists the dollar amounts. It is silent as to whether MBTA has waived its argument that the government should pay more than 14% of the cost. Thus it is appropriate to look at

---

2. The July 2 and July 9 letters are the subject of a Motion to Strike filed by the United States, on the ground that they were not "part of the record" of the Court of Federal Claims. The letters were presented to the trial court during argument of the motions for summary judgment. Although the government argues that they were not marked and admitted into evidence, these were summary judgment proceedings. These letters may be considered on appeal on the same basis

on which they were before the trial court. The extract quoted herein appears in the hearing transcript at pages 68–69. It is part of the proceedings under review. *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2716 (1983 & 1997 Supp.) (on review of summary judgment, appellate court can consider "those papers that were before the trial court"). The Motion to Strike is denied.

the surrounding circumstances, to determine whether this change order was intended to be, and is, a fully integrated settlement of the disputed issue. *See McAbee,* 97 F.3d at 1434 ("[I]t is not only the writing that controls whether the document is fully integrated, but also the circumstances surrounding its execution."); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1006 (1972) ("[T]he writing cannot prove its own integration."); Restatement (Second) of Contracts § 210 cmt. b (1975) (noting that whether a writing was adopted as a completely integrated agreement may be proved by "any relevant evidence," that "a writing cannot of itself prove its own completeness," and that "wide latitude" must be allowed for inquiry into surrounding circumstances).

The funding for the Headhouse floors was disputed for about three years before the change order was entered into. MBTA's argument that FRA was obligated to pay more than 14% is supported by § 2.2.1h, which expressly mentioned floors 3, 4, and 5 and not simply the space occupied by Amtrak. Thus there is plausibility to MBTA's statement that the purpose of Change Order 47 was to transfer the conceded 14% in 1988. The absence of an integration clause, or any reference to settlement of this large item, in any document or letter, also supports MBTA's argument. *See David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977) (circumstances surrounding execution are "especially pertinent in instances where ... the writing itself contains no recitals ... testifying to its intended completeness and finality"). Neither was there evidence of an intent to finally dispose of the dispute, nor sufficient and undisputed elements of an accord and satisfaction. *See Brock & Blevins Co., Inc. v. United States,* 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965) (an accord and satisfaction requires consideration and a meeting of the minds).

We conclude that the change order did not resolve the dispute as to the relative obligations with respect to the Headhouse floors. The summary judgment of the Court of Federal Claims is reversed. On remand the court shall determine the merits of the claim.

### F. Interest

MBTA seeks interest under the Intergovernmental Cooperation Act ("the Act"), which provides:

31 U.S.C. § 6503(d)(1). . If a State disburses its own funds for program purposes in accordance with Federal law, Federal regulation, or Federal–State agreement, the State shall be entitled to interest from the time the State's funds are paid out to redeem checks or warrants, or make payments by other means, until the Federal funds are deposited to the State's bank account.

The Act defines "State" as used therein to mean "a State of the United States, ... and an agency, instrumentality, or fiscal agent of a State," but not "a local government of a State." 31 U.S.C. § 6501(9). The Act excludes "political subdivisions" from the definition of "State." 31 U.S.C. § 6501(10).

FRA states that MBTA is not a State agency or instrumentality but is an "independent political subdivision" of the Commonwealth of Massachusetts. MBTA states that the Act's definition of "State" includes MBTA, citing (1) Massachusetts General Laws, c. 161A, § 1 *et seq.;* (2) an opinion wherein the Massachusetts Attorney General stated that "MBTA is properly defined as a 'state instrumentality,'" Opinion of the Massachusetts Attorney General dated July 24, 1977 at 9; and (3) a similar ruling of the United States Comptroller General in *In the Matter of the Status of Transit Authorities,* 56 Comp. Gen. 353, 356 (1977).

MBTA is an agency within the Executive Office of Transportation and Construction of the State of Massachusetts. MBTA states that its capital investment program and mass transportation plans are prepared under that office's direction and control, that the Governor appoints and may remove the members of MBTA's Board of Directors, and has authority in emergencies to take over and operate the MBTA. MBTA's status as an "instrumentality of a State," the words of § 6501(9), has been defined by the Massachusetts Attorney General and the United States Comptroller General. It is plain that by "political subdivision" the Act means local governments. 31 U.S.C. § 6501(10). The MBTA is

neither political, nor a subdivision, nor a local government. FRA has not presented any cogent argument to the contrary. These factors all require the conclusion that MBTA is a state instrumentality within the meaning of 31 U.S.C. § 6501(9).

Thus MBTA is a qualified entity for payment of interest under the Intergovernmental Cooperation Act.

Costs to MBTA.

*REVERSED AND REMANDED.*