NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition is not
citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

05-5017

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: February 8, 2006

_____

Before MICHEL, Chief Judge, SCHALL and GAJARSA, Circuit Judges.

MICHEL, Chief Judge.

Massachusetts Bay Transportation Authority ("MBTA") appeals the decision of the United States Court of Federal Claims awarding damages in the amount of $1,075,242.03, arguing that it was entitled to the full $3,964,567.21 sought, plus interest. Mass. Bay Transp. Auth. v. United States, No. 283-89C, slip op. (Fed. Cl. Oct. 8, 2004) ("Damages Decision"). MBTA also appeals the denial of its motion to disqualify the trial judge for bias and prejudice. Mass. Bay Transp. Auth. v. United States, No. 283-89C, slip op. (Fed. Cl. Aug. 16, 2002) ("Disqualification Decision"). Because the Court of Federal Claims did not abuse its discretion in assessing the

damages owed to MBTA but nonetheless failed to award interest, contrary to our previous remand instructions, we affirm-in-part, vacate-in-part and remand for further calculations. Additionally, we affirm the denial of MBTA's motion to disqualify because the Court of Federal Claims did not abuse its discretion in concluding that the trial judge's adverse legal rulings and courtroom remarks reflecting disagreements with MBTA's legal arguments were an insufficient basis for recusal.

## I.    BACKGROUND

This government-contract case reaches us after a long and tortured history, including two appeals to this court. The factual background was explained in our prior opinions and will not be repeated in similar detail here. See Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226 (Fed. Cir. 1997) ("MBTA I"); Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367 (Fed. Cir. 2001) ("MBTA II").

As part of its implementation of the Northeast Corridor Improvement Project for passenger rail service and stations from Washington D.C. to Boston under the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801 et. seq., the Federal Railroad Association ("FRA") entered into the Boston South Station Improvement Project Design Agreement ("the Design Agreement") with MBTA in 1980. This agreement established the scope of improvements to be made to South Station, which is owned by MBTA. In 1983, MBTA and FRA entered into the Boston South Station Transportation Center Project Cooperative Construction Agreement ("the Construction Agreement"), which required MBTA to implement the renovations set forth in the Design Agreement. Significantly, MBTA could not deviate from the design documents provided

by the architect-engineers ("A/Es") FRA had hired without first obtaining written approval from FRA.

The Construction Agreement contained several provisions directed to potential liability issues. Most relevant to this current dispute, § 222(c) obligated FRA to seek insurance endorsements from the A/Es for the benefit of MBTA:

> FRA shall secure from each of its consultant architect-engineers ("A/E's") an endorsement to the benefit of the MBTA on the professional liability insurance policy or policies carried by such A/E's with respect to any A/E errors, omissions, or acts of negligence in the design of the Facility. FRA shall furnish the MBTA evidence of such endorsements.

After the Construction Agreement was executed, FRA did not secure insurance endorsements from the A/Es and did not notify MBTA of its failure to do so.

In accordance with the Construction Agreement, MBTA solicited bids for the South Station project and awarded the contract to J.F. White Construction Company ("White") in 1984. After construction began, White informed MBTA that the design plans contained several serious defects. Consequently, the project was completed 956 days late at a cost of approximately $69 million. In September 1987, White submitted a claim to MBTA for its increased costs associated with the delay. MBTA subsequently brought a declaratory action in Massachusetts Superior Court against White, the A/Es, Amtrak, Boston Edison Company, and the Northeast Railroad Construction Company to resolve various liability issues ("the White Litigation"). The parties ultimately settled that lawsuit in 1995 for $3,810,000, with MBTA contributing $1.9 million, the A/Es collectively contributing $1.8 million, Amtrak providing $100,000 and Boston Edison paying the remaining $10,000. FRA was not a party, but encouraged the settlement and entered into mutual releases with the A/Es.

Meanwhile, in 1989, MBTA brought this suit against the United States. MBTA alleged, inter alia, that FRA breached § 222(c) of the Construction Agreement by failing to secure insurance endorsements from the A/Es. MBTA sought recovery of its expenditures from the White Litigation, with interest, including the $1.9 million paid to White and $2,064,567 in defense costs. This case was stayed pending resolution of the White Litigation, but the stay was lifted after that lawsuit settled.

The Court of Federal Claims granted summary judgment in favor of the government based on its interpretation of a different provision of the contract. This court reversed, holding that FRA breached its obligation to obtain insurance endorsements pursuant to § 222(c). MBTA I, 129 F.3d at 1232. We remanded the case for a determination of the consequences of that breach and an assessment of damages. Id. at 1233. On remand, the Court of Federal Claims held that MBTA was not entitled to any damages. See MBTA II, 254 F.3d at 1371 (referencing an unpublished order dated May 14, 1999). We reversed and remanded again, this time with specific instructions on calculating the damages stemming from FRA's failure to secure insurance endorsements on MBTA's behalf.

> On remand, the Court of Federal Claims has discretion, as it deems necessary, to reopen and supplement the record to allow for admission of new evidence from both parties on this issue. Alternatively, the Court of Federal Claims may make its determination based on the existing record. When making the proper finding, however, the Court of Federal Claims must take into account all relevant factors, including, but not limited to, causation by the parties, what would have been a reasonable or financially advantageous settlement in light of the original claim for $23.6 million, as well as the potentially high cost, large amount of time, and nuisance involved in going to trial. The court must then determine what amount (if any) a reasonable insurer, i.e., one insuring the A/Es directly and MBTA via the insurance endorsements, would have paid beyond the $1.8 million actually paid on behalf of the A/Es alone. Assuming that the insurers would have paid anything beyond the $1.8 million, the court must then

ascertain the total damages owed to MBTA, including appropriate associated legal costs and interest. The court may also consider whether any additional damages resulted from FRA's breach of section 222(c) by failing to notify MBTA in a timely manner that it would be unable to obtain the insurance endorsements.

Id. at 1377.

Soon thereafter, MBTA filed a motion to disqualify the trial judge for bias and prejudice pursuant to 28 U.S.C. § 455(a). The Court of Federal Claims denied the motion concluding that MBTA's "true complaint regards the court's legal decisions, not its conduct." Disqualification Decision, slip op. at 15.

On March 11, 2003, the Court of Federal Claims held an evidentiary hearing on damages. Damages Decision, slip op. at 20. It awarded MBTA damages in the amount of $1,075,242.03. Id., slip op. at 58. The court reasoned that since "MBTA has conceded that 53.9% of the compensable delays were caused by its own breaches of contract or negligence," a reasonable insurer would have paid "no part" of its $1.9 million share in settling the White Litigation and only $775,242.03 of the $2,064,567 incurred in fees and costs. Id., slip op. at 47, 57.[1] It also found that each insurer (i.e., one for each of the three A/Es) would have paid $100,000 to guarantee MBTA's cooperation with the settlement, totaling another $300,000. Id., slip op. at 57.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

[1] In reaching this figure, the Court of Federal Claims found FRA's expert, who had directly reviewed approximately 55% of the cost bills, to be more credible than MBTA's expert, who had reviewed none of the bills. Id., slip op. at 53, 56. The former testified that a reasonable insurer would have made adjustments to the "really high" billing rates, excessive copy fees and other charges. Id., slip op. at 53-55. Consistent with this testimony, the requested amount of $1,392,000 in attorney's fees was reduced by 27.5% to $1,009,499 and added to the $672,154 paid to expert witnesses and consultants for a total of $1,681,653 in allowable costs. Id., slip op. at 55. The court then determined that MBTA would have been responsible for 53.9% of this sum, while a reasonable insurer would have paid 46.1%, or $775,242.03. Id., slip op. at 57.

## II.    DISCUSSION

### A.

We review a trial court's findings about the general type of damages to be awarded (e.g., lost profits), their appropriateness (e.g., foreseeability), and rates used to calculate them (e.g., discount rate, reasonable royalty) for clear error. Home Sav. of Am. v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005). The methodology for calculating rates and amounts, however, is reviewed for an abuse of discretion. Id. Likewise, a decision to admit or exclude expert testimony is reviewed for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997). Here, the Court of Federal Claims was expressly instructed as to the type of damages to be awarded, namely, the amount that a reasonable insurer would have paid to settle the White Litigation. Because we are now asked to review the methodology for making that determination, we apply the abuse of discretion standard.

MBTA's arguments concerning the damages award can be summarized as follows. First, with respect to the $1.9 million paid to White, MBTA argues that the Court of Federal Claims failed to consider "all relevant factors" as it had been instructed to do. MBTA II, 254 F.3d at 1377. Specifically, it contends that the Court of Federal Claims ignored the potential liability of $23.6 million in considering what would have been a reasonable settlement and focused only on the actual settlement paid to White. Second, MBTA asserts that the Court of Federal Claims erred in reducing its costs because the A/E insurers would have had to defend it on any direct liability counts (as well as vicarious liability counts) in the White Litigation. See Aetna Cas. & Sur. Co v. Cont'l Cas. Co., 604 N.E.2d 30, 32 n.1 (Mass. 1991). Third, MBTA argues that the

court abused its discretion in allowing FRA to introduce expert testimony at the evidentiary hearing when no such evidence had been proffered at the 1998 trial. Fourth, MBTA claims that the court abused its discretion in sustaining FRA's objection to rebuttal testimony by its own expert. Fifth, MBTA complains that its expert's testimony should have been given more weight. These arguments are unpersuasive.

With respect to its determination of the amount a reasonable insurer would have paid to settle the White Litigation, the Court of Federal Claims was free to use the settlement amount actually paid to White (i.e., $3.8 million) as a starting point for its calculations and conclude that MBTA's portion thereof (i.e., $1.9 million) corresponded to the percentage of delay (i.e., 53.9%) that it conceded had been "caused by its own breaches of contract or negligence." Damages Decision, slip op. at 47. The court reasoned that even if FRA had secured insurance endorsements on MBTA's behalf in accordance with § 222(c) of the Construction Agreement, "MBTA would have acquired only derivative or vicarious coverage." Id., slip op. at 56. As MBTA proffered no evidence that any portion of the $1.9 million was instead attributable to its vicarious liability for the design errors by the A/Es rather than its own direct liability, the court did not abuse its discretion in determining that no reasonable insurer would have compensated MBTA for its contribution to the White settlement. Id., slip op. at 46, 57. MBTA's argument to the contrary appears to confuse an insurer's duty to indemnify with its duty to defend. See Boston Symphony Orchestra v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989) (holding that the duty to defend is broader because the duty to indemnify depends on whether the judgment is within the policy coverage).

Making downward adjustments to MBTA's legal fees in light of what a reasonable insurer would have allowed was also within the court's discretion. Nor did the Court of Federal Claims abuse its discretion in determining that a reasonable insurer would have only been responsible for 46.1% of MBTA's defense costs while MBTA (or its own insurer) would have had to cover the costs of defending against White's direct liability claims. Id., slip op. at 57.

As for the expert testimony, the Court of Federal Claims did not abuse its discretion in allowing FRA's expert to testify. Indeed, our remand instructions expressly invited the court "to reopen and supplement the record to allow for admission of new evidence from both parties." MBTA II, 254 F.3d at 1377. Further, MBTA had the same opportunity as FRA to proffer new evidence at the evidentiary hearing on remand; it simply chose not to take advantage of it.[2] Moreover, declining to allow MBTA's expert to testify on rebuttal was not an abuse of discretion. As the court correctly explained, the proffered testimony was not within the proper scope of rebuttal. Damages Decision, slip op. at 22. It was also within the court's discretion to accept the testimony of one expert and reject the testimony of the other. Ample reasons for discrediting MBTA's expert were provided and no clear error on the underlying fact-finding or credibility assessments has been shown. Id., slip op. at 22-25, 45-46.

Finally, MBTA argues that it is entitled to a calculation of interest on the damages award. We agree. Our remand instructions explicitly directed the Court of Federal Claims to include "appropriate associated legal costs and interest." MBTA II, 254 F.3d

---

[2] At the evidentiary hearing, MBTA "unexpectedly announced" that its expert "would testify solely as a rebuttal witness" and it would instead rely on his testimony from the 1998 trial. Damages Decision, slip op. at 21.

at 1377 (emphasis added).  Without explanation, it did not.  For this reason, we vacate-in-part and remand for the calculation and inclusion of interest in the final judgment.[3]  The damages award is otherwise affirmed.

### B.

MBTA argues that the trial judge was biased, on the basis of:  (1) an alleged history of adverse legal rulings and (2) a series of transcript excerpts capturing various disagreements between the judge and counsel.  The trial judge properly found that this evidence was not sufficient to justify recusal.  See Charron v. United States, 200 F.3d 785, 789 (Fed. Cir. 1999).  In short, MBTA failed to demonstrate the existence of the kind of "deep-seated prejudice or antagonism that would make fair judgment impossible."  Liteky v. United States, 510 U.S. 540, 555 (1994) (noting that unfavorable judicial rulings are almost invaribly "proper grounds for appeal, not for recusal").  We therefore affirm the denial of MBTA's recusal motion.

### III.    CONCLUSION

For the foregoing reasons, we affirm-in-part, vacate-in-part and remand for a calculation of interest on the awarded damages and inclusion of that amount in the total sum owed to MBTA.

---

[3]     At oral argument, counsel for the government agreed that a remand for further consideration of this issue would be appropriate.

05-5017                                    9