**PUBLIC SERVICE COMPANY OF OKLAHOMA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 08–501 C.**

United States Court of Federal Claims.

July 22, 2009.

Tom Q. Ferguson, Tulsa, OK, for plaintiff.

Kent C. Kiffner, United States Department of Justice, with whom were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Martin F. Hockey, Jr., Assistant Director, Washington, DC, for defendant. Lisa M. Satterfield, United States Army Litigation Division, Arlington, VA, of counsel.

## OPINION

BUSH, Judge.

This case is before the court on cross-motions for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). These motions have been thoroughly briefed, and oral argument was neither requested by the parties nor deemed necessary by the court. The scope of the parties' briefing has been restricted to a question of contract interpretation, and does not address arguments based on waiver of contract rights by either party. Jt. Mot. to Enter Scheduling Order at 1. For the reasons set forth below, the court grants defendant's motion and denies plaintiff's motion.

## BACKGROUND[1]

Plaintiff Public Service Company of Oklahoma (PSO) is an electric utility company

---

1. The facts recounted here are taken from the parties' pleadings and briefs, and appear to be

operating in certain parts of Oklahoma. Compl. at 1. The McAlester Army Ammunition Plant (MCAAP) of the United States Army is located in one of PSO's service areas, and PSO is the exclusive provider of retail electric service in that part of Oklahoma. Pl.'s Mot. at 5 n. 1. MCAAP and PSO entered into Contract No. DAAA31–97–C–0002 (the contract) on June 9, 1997 to "[p]rovide electric power and energy to fulfill MCAAP's electric service requirements." Compl. Ex. A at 1, 3. The parties dispute the meaning of this contract as it pertains to the amount MCAAP should have paid PSO for a period of time beginning in February 2006.[2] Compl. Ex. B at 2. PSO seeks $159,007.94, the amount it asserts it has been underpaid under the contract, and a declaratory judgment as to the correct interpretation of the contract. *Id.* ¶¶ 54–59.

The contract is not merely a simple agreement whereby MCAAP has agreed to pay PSO for the electricity it consumes. Instead, the contract establishes a relationship between the parties which includes, most importantly, provisions governing the price MCAAP pays for the electricity provided by PSO, provisions governing the price PSO pays MCAAP for federal hydro power MCAAP has purchased from the United States Department of Energy, and a provision that allows MCAAP a "setoff" against its payment obligation to PSO in the amount of PSO's payment obligation to MCAAP. *See* Compl. Ex. A at 24. This dispute focuses almost entirely on the price PSO must pay MCAAP for federal hydro power.

## I. Southwestern Power Administration

The setoff mitigating MCAAP's payment obligations to PSO derives from MCAAP's relationship with the Southwestern Power Administration (SWPA), part of the United States Department of Energy. "MCAAP ... has access to an electric supply that most customers do not[;] ... MCAAP can buy hydro-generated electricity from SWPA ...

[that] is often cheaper than power generated from other sources." Pl.'s Mot. at 2. The SWPA provides what the contract calls "Federal Energy" to MCAAP through PSO's transmission services and the contract enables MCAAP to reduce its payment obligation to PSO based on the amount of Federal Energy MCAAP has purchased from SWPA (and which is immediately sold to PSO). Compl. ¶ 20, Ex. A at 24. The amount of the setoff is governed by a formula set forth in the contract, and varies, in relevant part, according to this defined term:

> Amount payable in dollars by MCAAP to SWPA for Federal Energy [s]cheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A in effect on May 22, 1997. *(Exhibit E)*.

Compl. Ex. A at 22 (emphasis in original).

## II. The Contract

### A. Generally

The contract at issue here did not initiate electric service to MCAAP. Prior to June 1997, the same three entities were involved and the same types of transfer of energy occurred: SWPA sold Federal Energy to MCAAP, and PSO provided electricity [PSO Energy] and transmitted Federal Energy to MCAAP. Pl.'s Mot. at 2–3. The contractual arrangement before 1997 was different, however, because SWPA contracted directly with PSO for its transmission services, and passed through most of the costs of PSO's transmission services to MCAAP. Pl.'s Mot. at 3; Compl. Ex. A at 74. In 1997, federal law required SWPA to step out of its role as manager of the transmission of power to MCAAP, and thus MCAAP itself entered into a contract with PSO that covered transmission of Federal Energy from SWPA to MCAAP. Pl.'s Mot. at 3; Compl. Ex. A at 74. In addition, PSO and MCAAP continued their contractual relationship as power company and customer. Pl.'s Mot. at 3. These

undisputed, unless otherwise noted. The court makes no findings of fact in this opinion.

**2.** A more detailed description of the alleged underpayment, referencing events in 2005 and 2006, appears in the text of the complaint. The certified claim presented to the contracting officer mentions only an underpayment "beginning in February 2006." Compl. Ex. B at 2. The precise beginning date of the alleged underpayment is immaterial to the resolution of the cross-motions before the court.

relationships were embodied in the contract entered into on June 9, 1997. *See* Compl. Ex. A.

The contract includes several parts within its ninety-seven pages, but the court's focus is primarily on these portions of the contract: a summary description, Compl. Ex. A at 3–4; the "General Provisions" section, *id.* at 5–11; the Electric Service Agreement (governing, among other terms, the price paid to PSO by MCAAP for all electricity consumed by MCAAP), *id.* at 15–19; the Power Agreement (governing, among other terms, the price paid by PSO to MCAAP for the Federal Energy purchased by MCAAP from SWPA, an important factor in calculating MCAAP's setoff), *id.* at 20–28; and, the contract exhibits, *id.* at 47–97. Although SWPA is not a party to the contract, MCAAP's separate contract with SWPA for the purpose of purchasing Federal Energy (SWPA–MCAAP contract) is integral to the relationship between PSO and MCAAP. Indeed, one contract summary describes the SWPA–MCAAP contract before turning to any other aspect of the relationship between PSO and MCAAP. This summary description of the contract is reproduced here in its entirety:

> WHEREAS, MCALESTER ARMY AMMUNITION PLANT (MCAAP) HAS, OR WILL CONTRACT TO PURCHASE ELECTRIC POWER AND ENERGY FROM SOUTHWESTERN POWER ADMINISTRATION (SWPA), AND
>
> WHEREAS, CONTRACTOR [PSO] SHALL PURCHASE AND RECEIVE ALL THE FEDERAL ENERGY TO WHICH THE GOVERNMENT IS ENTITLED TO RECEIVE PURSUANT TO GOVERNMENT'S CONTRACT WITH SWPA, AND
>
> WHEREAS, MCAAP SHALL PURCHASE ELECTRIC POWER AND ENERGY REQUIREMENTS FROM CONTRACTOR, AND
>
> WHEREAS, MCAAP MAY BE LIMITED IN THE QUANTITY OF SUCH ELECTRIC POWER AND ENERGY AVAILABLE FROM SWPA BECAUSE OF THE GENERATING CAPABILITY AND OPERATING CHARACTERISTICS OF THE RESERVOIR DAM PRO-

JECTS FOR WHICH SWPA HAS BEEN DESIGNATED AS THE MARKETING AGENCY, AND UNDER THE TERMS AND CONDITIONS HEREINAFTER SET FORTH,

> NOW, THEREFORE, CONTRACTOR WILL PROVIDE AS FOLLOWS:

Compl. Ex. A at 4.

MCAAP's forty-page contract with SWPA is attached to the contract as Exhibit E. Compl. Ex. A at 58–97. The final six pages of Exhibit E are an attachment to the SWPA–MCAAP contract, and are titled:

> UNITED STATES DEPARTMENT OF ENERGY SOUTHWESTERN POWER ADMINISTRATION RATE SCHEDULE P–90A[ ]
>
> WHOLESALE RATES FOR HYDRO PEAKING POWER AND SEASONAL PEAKING POWER

*Id.* at 92–97. The court notes that the contract attached and referenced a copy of SWPA rate schedule P90–A (P90–A), an attachment to the SWPA–MCAAP contract, that did not, within the four corners of the schedule, indicate that it was still in force on June 9, 1997, the date the contract was signed, or even that it was in force on December 31, 1996, the date the SWPA–MCAAP contract was signed. *See id.* ("This rate schedule has been extended . . . through September 30, 1996."); *see also id.* at 60. P90–A was nonetheless the SWPA rate schedule applicable in Oklahoma for the customers of SWPA such as MCAAP, at the time the contract was signed by the parties to this suit on June 9, 1997. *See* Compl. Ex. A at 92; *see also* Pl.'s Facts ¶¶ 41, 46. At the time the contract was signed, SWPA had six different rate schedules, in force, for various energy services: P–90A, P–90B, F–90B, TDC–90, IC–90, and EE–90. *See* U.S. Dep't of Energy, Notice of Order Approving New [SWPA] Power Rates on an Interim Basis, 63 Fed.Reg. 2383 (Jan. 15, 1998).

The contract term had an initial period beginning on June 1, 1997 and ending on December 31, 1998. Compl. Ex. A at 6. The contract would remain in force, year to year, "if MCAAP continues to take service after the expiration of the initial period, . . . until

terminated by the party desiring termination giving the other party at least 12 months prior written notice." *Id.* The contract has never been modified, and remains in force today.[3]

### B. The Contract's Relevant Energy Price Terms

More than half of the contract is devoted to enclosures and exhibits which provide detail and reference material related, in large part, to the electric rates and fuel charges that apply to the energy being transferred from one party to the other. For example, Exhibits A and A1 are the then-current rate schedules applicable to the electricity consumed by MCAAP, rates which determined the amount MCAAP owed to PSO for its electric consumption each month. *See* Compl. Ex. A at 16, 47–54. PSO had various rate schedules approved by the Oklahoma Corporation Commission in effect at the time the contract was signed, and the contract stated that PSO had given MCAAP the most favorable applicable rates for its electric service. *See id.* at 6–8, 16. Exhibits B and C identify certain fuel charges that PSO applies to its electric rate schedules, and presumably because these fuel charges are not applicable to the hydro power MCAAP receives from SWPA and sells to PSO, the amount of fuel charges that roughly correspond to the amount of Federal Energy sold to PSO constitute a portion of the setoff of MCAAP's payment liability to PSO under the contract.[4] *See id.* at 22, 45–46 (showing that MCAAP traditionally consumed a varying mix of "hydro-energy" and "thermal energy"), 55–56 (showing that PSO's fuel charges derive in part from "[t]he average cost of fuel [for PSO's] thermal generating units," not from a fuel cost for hydro power sources).

Similarly, Exhibit E, the SWPA–MCAAP contract, describes the price MCAAP must pay to SWPA for Federal Energy. *See* Compl. Ex. A at 67–69. The price is established initially by the rates set forth in P–

90A, but may "be increased, decreased, modified, or superseded, at any time, and from time to time," by the appropriate approving authority. *Id.* at 68. In addition, MCAAP was allowed a transitional and decreasing credit related to its prior contractual arrangement with SWPA, so that each month MCAAP's bill from SWPA would be reduced from the amount normally due under P–90A, from June 1, 1997 through May 31, 2001. *Id.* at 75.

As this examination of the contract shows, the contract explicitly references anticipated changes in the cost of Federal Energy, in Exhibit E. Compl. Ex. A at 68. The contract also explicitly anticipates and references changes in the cost of the electricity provided by PSO to MCAAP, such as changes in rates authorized by the Oklahoma Corporation Commission. *Id.* at 7, 15. In addition, the contract identifies fuel charges, a component of the formula determining MCAAP's setoff against its PSO bill, as being "in accordance with PSO's Oklahoma Corporation Commission approved [rate]" or at "PSO's applicable Oklahoma Corporation Commission approved [rate]." *Id.* at 22. The fuel charges are also described as being determined, at least in part, by a formula which depends on variables such as the recent average cost of fuel and the recent average amount of thermal energy required to produce one kilowatt hour of power. *Id.* at 56. Thus, changes in the fuel charges are also clearly contemplated by the contract.

These three contract terms—the cost of PSO Energy, the cost of Federal Energy, and the fuel charges—are all described by the contract as evolving over time, but are also described by references to exhibits which show the then-current applicable rates for these items at the time the contract was signed. *See* Compl. Ex. A at 15–16, 22, 47–56, 67–69, 74, 92–97. Although there are variations as to how the relevant exhibits showing the then-current rates for each of these items are referenced in the Electric

---

3. Modification of contract terms is alleged to have been the subject of discussions between the parties. *See* Compl. ¶¶ 45–46, Ex. C at 4 n. 1.

4. The two fuel charges are PSO's embedded fuel cost and fuel cost adjustment, identified in part by Exhibits B and C which show the then-current rates for these fuel charges. Compl. Ex. A at 22, 55–56.

Service Agreement or the Power Agreement, these differences are slight. For PSO Energy, the rate schedules are described in this sentence of the Electric Service Agreement: "PSO has determined that for the [two MCAAP] delivery points, the LPL–1 ... Rate Schedule (Exhibit A) and the LUGS ... Rate Schedule (Exhibit A1), respectively, are the most favorable for MCAAP given its conditions of service at each location." *Id.* at 16. The fuel charges are defined in the Power Agreement as "PSO's applicable Oklahoma Corporation Commission approved embedded fuel cost (Exhibit B)," and "Fuel Cost Adjustment (FCA) in accordance with PSO's Oklahoma Corporation Commission approved Fuel Cost Adjustment Rider (Exhibit C)." *Id.* at 22. Finally, the Federal Energy cost is identified in the Power Agreement as the "[a]mount payable in dollars by MCAAP to SWPA for Federal Energy [s]cheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A in effect on May 22, 1997. *(Exhibit E)*." *Id.* (emphasis in original).

The court notes that the contract includes a number of statements that show that the contract, with its enclosures and exhibits, is an integrated document that contains the entire agreement of the parties. As a threshold matter, the contract exhibits are fully integrated into the contract. A brief description of the services acquired by the contract, for example, states that PSO will:

Provide electric power and energy to fulfill MCAAP's electric service requirements. Account for and compensate MCAAP for all Federal Power and Energy available from Southwestern Power Administration in accordance with: Section C [the contract description/work statement, including

the General Provisions, Electric Service Agreement and Power Agreement]; Enclosures 1, 2; Exhibits A, A1, B, C, D, E.

Compl. Ex. A at 3. In addition, a provision of the Power Agreement specifically designates the contract exhibits as constituent parts of the contract: "Any and all Exhibits referred to in this Agreement are, by such reference, incorporated herein and made a part hereof for all purposes." *Id.* at 27. Finally, there is an integration clause that specifically states that the contract exhibits are integral parts of the contract:

*Entirety.* This Agreement and the Exhibits hereto constitute the entire Agreement between the Parties. There are no prior or contemporaneous agreements or representations affecting the same subject matter other than herein expressed. Except for any matters which, in accordance with the express provisions of this Agreement, may be resolved by verbal agreement between the Parties, no amendment, modification or change herein shall be enforceable unless reduced to writing and executed by both Parties.

*Id.* at 27. For these reasons, the court's inquiry in this matter focuses on the language of the contract, including the exhibits, in order to resolve this dispute.[5]

### III. The Dispute

Reducing this dispute to its simplest terms, plaintiff now asserts that the contract mandates that PSO pay MCAAP for any Federal Energy acquired from SWPA at a price that reflects the rates set by P–90A in 1997, even if that rate schedule has been superseded and MCAAP is paying more for the Federal Energy it acquires from SWPA.[6]

---

5. As plaintiff points out, the contract resolves inconsistencies or conflicts between contract provisions and exhibit provisions in favor of contract provisions. Pl.'s Mot. at 15–16. The "Conflicts" clause of the contract's General Provisions states that "[t]o the extent of any inconsistency between the provision[s] of this contract, and the provisions of any schedule, rider, or exhibit incorporated in this contract by reference or otherwise, the provisions of this contract shall control." Compl. Ex. A at 11. An "Order of Precedence–Utilities" clause in the Contract Clauses section of the contract states that "[i]n the event of any inconsistency between the terms

of this contract (including the specifications) and any rate schedule, rider or exhibit incorporated in this contract by reference or otherwise, or any of the Contractor's rules and regulations, the terms of this contract shall control." *Id.* at 37 (referencing 48 C.F.R. § 52.241–2 (2008)). The court does not, however, see any inconsistency here that requires application of the conflicts or order of precedence clauses of the contract.

6. MCAAP's full setoff amount established by the contract depends on other factors as well, but

Pl.'s Mot. at 10 (arguing that the reference to P–90A and May 22, 1997 precludes the use of any subsequent SWPA rate schedules in the setoff formula). Defendant counters that the contract requires PSO to pay MCAAP for Federal Energy according to the rate schedule in effect at the time that Federal Energy is acquired through the SWPA–MCAAP contract. Def.'s Mot. at 15 (arguing that "the Contract requires PSO to use subsequently adopted [SWPA] rate schedules when calculating" the setoff). The parties' dispute appears to have surfaced many years after the initial period of the contract expired.

A precise chronology of the dispute between the parties is not an issue of material fact in the parties' cross motions because the issue before the court is one of contract interpretation. The court reports the following allegations of fact purely for context. Plaintiff asserts that MCAAP paid its PSO bill with a setoff calculated according to P–90A for several years after P–90A had been superseded and replaced by other SWPA rate schedules. Compl. ¶¶ 36–37; Pl.'s Facts ¶¶ 49–50. The certified claim submitted to the contracting officer by plaintiff references discussions on September 15, 2005 and September 12, 2006, as well as an allegation that MCAAP began underpaying its PSO bill "beginning February 2006." Compl. Ex. B at 2. The complaint presents a more detailed, and somewhat divergent version of events.

MCAAP is alleged by plaintiff to have begun underpaying its PSO bills "[i]n or around January, 2005." Compl. ¶ 38. Plaintiff alleges that MCAAP instructed a PSO employee "in the Spring of 2005" to switch from the P–90A rate to a successor rate, the P–04 rate, for calculating the setoff against MCAAP's PSO bill. Id. ¶ 39. According to plaintiff, the PSO employee accordingly began calculating MCAAP's setoff according to the P–04 rate, but PSO management switched the calculation back to the P–90A rate by October 1, 2005. Id. ¶¶ 40–41. Plaintiff states that MCAAP fully paid its bill for three months with the setoff calculated according to P–90A, from October 2005 through December 2005, but again began to underpay its bill "[i]n or around January,

2006," and continues to do so. Id. ¶¶ 43–44, 47. The alleged underpayments are derived from MCAAP's reliance on current SWPA rate schedules for Federal Energy, such as P–04, P–05 or P–06, rather than P–90A, for the setoff calculation. Id. ¶¶ 38, 48.

Defendant, on the other hand, states that MCAAP noticed that its setoff against the PSO bill and its bill from SWPA for Federal Energy showed "a growing discrepancy," and contacted PSO "as early as January 2004." Def.'s Resp. to Pl.'s Facts ¶ 49. Defendant asserts that MCAAP contacted PSO's billing department and received corrective action. Id. Defendant alleges that PSO notified MCAAP in June 2006 that the current SWPA rates would no longer be used "to make the adjustment to the Federal Energy charge." Id. Defendant agrees with plaintiff that MCAAP made adjustments to its PSO bill based on a setoff calculation using current SWPA rate schedules for Federal Energy. Id.

## DISCUSSION

### I. Jurisdiction

In the present case, plaintiff relies on the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2006) (CDA), and the Tucker Act, 28 U.S.C. § 1491 (2006), to provide a jurisdictional basis for its claim. Compl. ¶ 3. The Tucker Act provides the court with jurisdiction to entertain contract claims brought under the CDA. See 28 U.S.C. § 1491(a)(2). For this court to take jurisdiction over such a suit, however, the contractor, as a prerequisite, must have presented a written claim to the contracting officer. See 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."); England v. Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed.Cir.2004) ("We have held, based on the statutory provisions [of the CDA], that the jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." (citing James M.

these are not in dispute. See Compl. Ex. A at 22.

*Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996))). Here, jurisdiction over this suit is undisputed, because PSO has submitted a certified claim to the contracting officer, and the contracting officer has issued a final decision denying that claim. *See* Compl. Exs. B, C.

## II. Standard of Review for RCFC 56 Cross–Motions

■ The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." RCFC 56(c)(1). Cross-motions for summary judgment "are not an admission that no material facts remain at issue." *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997) (citing *United States v. Fred A. Arnold, Inc.,* 573 F.2d 605, 606 (9th Cir.1978)). The parties may focus on different legal principles and allege as undisputed a different set of facts. *Id.* "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.*

■ "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting former version of Fed. R.Civ.P. 56(c)). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment "motion may, and should, be granted so long as whatever is before the ... court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Celotex,* 477 U.S. at 323,

106 S.Ct. 2548. "[S]ummary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987) (internal quotations and citations omitted).

■ As is typical of cases filed under the CDA, this suit centers on a question of contract interpretation. "Contract interpretation is a matter of law...." *Neal & Co. v. United States,* 945 F.2d 385, 390 (Fed.Cir. 1991) (citing *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985)). Contract interpretation presents a question of law which is "amenable to decision on summary judgment." *Gov. Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 812 n. 1 (Fed.Cir.1988) (citation omitted).

## III. Analysis

Plaintiff, in its opening brief, invokes a large number of doctrines of contract interpretation, including: examining the plain meaning of the contract language; viewing the contract as a whole; giving meaning to all contract provisions; deciding whether extrinsic evidence is needed to understand the contemporaneous circumstances of the contracting parties; determining the intent of the parties; deciding whether the contract allocates risk to one party or the other; and, resolving contradictions with a conflicts clause. *See generally* Pl.'s Mot. at 6–19. Defendant, in its opening brief, cites to some of the same rules and doctrines and adds more: avoiding commercially impracticable or otherwise nonsensical interpretations of contract terms; considering whether there are ambiguities in the contract, and whether these are patent or latent; obeying the parol evidence rule; applying the rule of *contra proferentem;* taking industry standards into consideration; and, examining the parties' course of performance. *See generally* Def.'s Mot. at 7–23. Each party argues that the contract is unambiguous, in its favor. Pl.'s Reply at 4; Def.'s Mot. at 7, 19. As a threshold matter, the court reviews the contract law principles relevant to this dispute.[7]

7. The parties largely base their arguments on

federal law. The court agrees that federal law

 Contract interpretation begins with the plain language of the contract terms. *McAbee Constr. Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996) (citations omitted). The court must also interpret a contract "as a whole and 'in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.'" *United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 737 (Fed.Cir. 1997) (*UIIS*) (quoting *Granite Constr. Co. v. United States,* 962 F.2d 998, 1003 (Fed.Cir. 1992)). A contract term is unambiguous when it gives rise to only one reasonable interpretation. *C. Sanchez & Son, Inc. v. United States,* 6 F.3d 1539, 1544 (Fed.Cir. 1993).

 The court agrees with the parties that the contract, when viewed as a whole, is unambiguous as to which SWPA rate schedule must be used to calculate the setoff of MCAAP's payment liability to PSO, because there is only one reasonable interpretation of that contract provision. For this reason, the court will not consider extrinsic evidence of industry standards, contemporaneous circumstances, the parties' intent or their course of performance. *See City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir. 1994) ("[E]xtrinsic evidence ... may not be considered unless an ambiguity is identified in the contract language." (citing *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972))). In the alternative, to the extent that any ambiguity might be found in this contract term, the court finds that such an ambiguity would be latent. *See United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir.1987) (defining latent ambiguities as pertaining to cases where there are no contract "provisions 'so glaring as to raise a duty to inquire'" (quoting *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982))). The reasonable interpretation advanced by the drafter of a contract term containing a latent ambiguity will not prevail over the reasonable interpretation of that term by the non-drafting party, according to the rule of *contra proferentem.*

*Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992) (*IGGC*) (citing *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 497 F.2d 1402, 1407 (1974)). The court now applies these principles to the parties' dispute.

## A. The Setoff Formula, Even When Viewed in Isolation, Does Not Support PSO's Position

The court turns its focus to the plain meaning of the setoff formula, as it applies to the controlling SWPA rate schedule for Federal Energy. The contract provides a definition for one of the setoff formula's terms, "Federal Energy," in the definition section of the Power Agreement:

> "Federal Energy" means hydro electric power and associated energy generated at United States Army Corps of Engineers operated dams and marketed by the Southwestern Power Administration including, without limitation, energy scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A.

Compl. Ex. A at 20. This definition encompasses both power delivered while SWPA's P–90A rate schedule was in effect, and power delivered under subsequent SWPA rate schedules. The court notes that PSO is required to purchase any and all Federal Energy that MCAAP obtains from SWPA pursuant to the SWPA–MCAAP contract. *See* Compl. Ex. A at 4–5, 21. The court also notes that SWPA had multiple rate schedules in effect at the time the contract was signed. *See supra.* Thus, the contract defines Federal Energy as all hydro power purchased by MCAAP pursuant to the SWPA–MCAAP contract, not limited to hydro power purchased according to P–90A, and identifies the applicable SWPA rate schedule then in effect, P–90A.

The court now turns to the relevant part of the setoff formula, which defines an item designated "SE" as follows:

controls the interpretation of this government contract. *See Prudential Ins. Co. of Am. v. United States,* 801 F.2d 1295, 1298 (Fed.Cir.1986) ("It is well settled that contracts to which the govern-

ment is a party ... are normally governed by federal law, not by the law of the state where they are made or performed.") (citations omitted).

Amount payable in dollars by MCAAP to SWPA for Federal Energy Scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P90A in effect on May 22, 1997. *(Exhibit E).*

Compl. Ex. A at 22.[8] The definition of SE is not a model of flawless English construction. Likewise, the next item description in the formula, "ME," also fails as an example of impeccable syntax. ME is defined as: "An amount of PSO energy (KWH) equivalent to the amount of energy (KWH) multiplied by a factor of .9744 scheduled for and delivered to MCAAP by SWPA to the Delivery Point." *Id.* Nevertheless, the Federal Energy "price" item in the setoff formula, designated SE, is adequately described.

■ The court must give meaning to all parts of the SE description. The choice of the May 22, 1997 date, in the phrase "SWPA rate schedule P[-]90A in effect on May 22, 1997," merits discussion. The parties have asserted that May 22, 1997 does not indicate an effective date, or a termination date, of any order from the Department of Energy related to P-90A. Pl.'s Facts ¶¶ 42–43; Def.'s Facts ¶¶ 21–22. The only explanation of the choice of May 22, 1997 as the date indicating that P-90A was "in effect," as opposed to some other date roughly contemporaneous with the contract's execution, is given by defendant, and this explanation is uncontroverted by plaintiff: "[T]he parties chose May 22, 1997 simply because they anticipated that it would be the date upon which the Contract would be executed." Def.'s Mot. at 13 n. 3. The court notes that the contract was signed by PSO on May 29, 1997, and subsequently by MCAAP on June 9, 1997. Compl. Ex. A at 1. The court need not consider extrinsic evidence where defendant's unchallenged argument, as well as the contract signature dates, indicate that May 22, 1997 identifies the P-90A rate schedule as the controlling SWPA rate schedule in effect at the time the parties were finalizing and entering into their agreement.

■ There is some tension between three different elements of the setoff formula relat-ed to the price of Federal Energy: the identification of the then-current SWPA rate schedule, P-90A; the reference to Exhibit E, wherein the SWPA–MCAAP contract explicitly provides for SWPA rate schedule changes; and, the definition of Federal Energy, which describes Federal Energy as not being limited to hydro power scheduled and delivered according to P-90A. *See* Compl. Ex. A at 20, 22, 68. Plaintiff suggests that the only way to resolve this tension is to focus only on the phrase "[a]mount payable in dollars by MCAAP to SWPA for Federal Energy [s]cheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A in effect on May 22, 1997." Plaintiff's proposed interpretation ignores both Exhibit E, part of the definition of SE set forth in the setoff formula, and the definition of Federal Energy, provided two pages earlier in the Power Agreement. The court must, however, give meaning to all of these terms, and may not render these terms surplusage. *See UIIS,* 109 F.3d at 737 (citation omitted).

The only reasonable way to give meaning to all of these elements in the definition of the price of Federal Energy within the setoff formula is to refer to Exhibit E, as the definition of SE indicates. Exhibit E attaches P-90A, and thus identifies the then-current SWPA price schedule applicable to the setoff formula at the time the contract was drafted and signed. Compl. Ex. A at 92–97. Exhibit E also indicates that the SWPA rate schedule may change during the life of the contract, and that P-90A may be superseded. *Id.* at 68. Nonetheless, Federal Energy will continue to be scheduled and delivered according to new SWPA rate schedules. *Id.; see also id.* at 20 (describing Federal Energy as not being limited to hydro power scheduled and delivered in accordance with P-90A). The definition of SE in the setoff formula, referring explicitly to the SWPA–MCAAP contract attached as Exhibit E, indicates that applicable, current SWPA rate schedules, beginning with but not end-

---

**8.** The drafter's choice of the letters "SE" to describe the dollar amount representing the cost of Federal Energy in the formula is not explained in the contract. Similarly, the choice of the letters used to represent other formula terms such as "FSE," "ME," "A1" and "A2" is unexplained.

ing with P–90A, will determine the cost of Federal Energy to PSO.

There is another reason why the setoff formula cannot be read to fix the price of Federal Energy to the P–90A rate schedule, as opposed to the current, effective SWPA rate schedule. Federal Energy may be, according to the contract, "energy scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A," or energy scheduled for and delivered to MCAAP under subsequent rate schedules. *See* Compl. Ex. A at 20. The SE definition describes the price of Federal Energy as the "[a]mount payable in dollars by MCAAP to SWPA for Federal Energy [s]cheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A in effect on May 22, 1997." *Id.* at 22. Once P–90A has been superseded, *no more SWPA power* is "scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P[-]90A in effect on May 22, 1997"—SWPA power is then scheduled and delivered according to P–98A or whatever rate is then in effect. One cannot decouple the "scheduled for and delivered" terminology from the "price for Federal Energy set by P–90A" concept in this phrase of the setoff formula. In other words, plaintiff cannot get the pricing from P–90A for power that is not "scheduled and delivered" under that rate schedule.[9] If carried to its ultimate and extreme conclusion, plaintiff's insistence on the P–90A rate schedule as the only SWPA rate schedule for SE would mean that the setoff formula contains *no price provision* for SWPA power scheduled and delivered under subsequent SWPA rate schedules. This is not a reasonable interpretation of the contract and the setoff formula.

## B. When Viewed as a Whole, Contract References to Rate Schedule Exhibits Indicate Currently Effective Rates, Not Rates Fixed for the Initial Term of the Contract, or for the Life of the Contract

As the court explained in the Background section of this opinion, several exhibits to the contract identify then-current 1997 rates governing the price of power, and through these exhibits the contract describes certain aspects of the relationship between the parties. *See* Compl. Ex. A at 47–56, 58–97 (Contract Exhibits A, A1, B, C and E). The contract explicitly contemplates changes to these rates in the General Provisions, in the Electric Service Agreement, in the Power Agreement, and within the exhibits themselves. *Id.* at 7, 15, 22, 56, 68. The changed rates then applied to the contract, without any further action of the parties. *See id.* The contract as a whole incorporates changing rates affecting the price of power and the payment responsibilities of the parties. The contract repeatedly identifies and attaches current rate information, yet, at the same time, recognizes that such rates will change. It is unreasonable to read the setoff formula as being in conflict with this overall scheme, when, within the setoff formula, a reference is made to an exhibit which both identifies the current SWPA rate schedule and mandates that SWPA rate schedule changes will apply to Federal Energy sold to MCAAP. For these reasons, the contract as a whole must be read to tie the price for scheduled and delivered Federal Energy to the actual, effective SWPA rate schedules for that Federal Energy.

██ The court turns to plaintiff's arguments against this construction of the contract.[10] Plaintiff suggests that the length of

---

**9.** PSO could have drafted the setoff formula to have the meaning plaintiff now advances. For example, SE could have been defined to be the "amount payable, at the rates established by SWPA rate schedule P–90A in effect on May 22, 1997, for all of the Federal Energy scheduled for and delivered to MCAAP until this contract terminates."

**10.** The court addresses here plaintiff's arguments that defendant's interpretation of the setoff formula is unreasonable. If, as defendant argues,

Def.'s Reply at 1–5, plaintiff is also raising arguments as to the equities of the contract terms, equitable considerations are not within this court's review under the CDA. *See, e.g., Hardwick Bros. Co., II v. United States,* 36 Fed.Cl. 347, 421 (1996) ("[T]his court is without discretion under the CDA to shift the responsibilities assumed by the parties under the Contract ... or to find for one party over the other based solely upon equitable considerations."), *aff'd,* 168 F.3d 1322, 1998 WL 539463 (Fed.Cir.1998).

the initial term of the contract shows that "[t]he Contract, as written, was never designed to be a long-term contract." Pl.'s Mot. at 13. In the court's view, it is of no significance that the initial term of the contract was for nineteen months. The initial contract term ended on December 31, 1998. Compl. Ex. A at 6. The parties could have had any number of reasons, at the beginning of June 1997, for allowing the initial term of this contract to run for a period of time which expired at the end of the next calendar year.

It is clear from the contract language that unless a party took affirmative steps, the relationship established by the contract would be a long-term relationship. Compl. Ex. A at 6 ("[T]his contract shall continue in full force and effect from year to year thereafter until terminated by the party desiring termination giving the other party at least 12 months prior written notice."). The contract has been in existence for over twelve years. P–90A was superseded before the initial term of the contract expired, and SWPA rate schedules subsequently applicable to the SWPA–MCAAP contract have changed many times since then. See Pl.'s Facts ¶ 46. The court finds nothing irrational or unreasonable in contract provisions which identify current prices for energy, and simultaneously account for changes in those prices over time.

In addition, PSO claims that it would be "commercially unreasonable" to allow MCAAP to escape the burdens of rising SWPA rates for hydro power, by increasing its setoff against its PSO bill each time the SWPA rates go up. Pl.'s Reply at 5. The court disagrees with plaintiff's characterization of the contract. The parties entered into a contract which establishes a complex commercial relationship. There is nothing unreasonable or irrational in that relationship.

At the risk of an over-simplification in describing that relationship, PSO is fully paid for PSO Energy sold to MCAAP, at changing

rates approved by the Oklahoma Corporation Commission. According to the historical usage documents in the contract, PSO Energy constituted a substantial portion of MCAAP's power consumption, but PSO Energy was just part of MCAAP's overall power consumption. See Compl. Ex. A at 45–46. The monthly PSO bill described in the contract is for all electricity consumed by MCAAP, which includes both Federal Energy and PSO Energy.[11] Id. at 15.

For Federal Energy, SWPA is fully paid according to the current SWPA rate schedule and the SWPA–MCAAP contract. See Compl. Ex. A at 58–91. MCAAP pays SWPA for the Federal Energy it consumes, delivered by PSO, at rates that have been rising. Compl. Ex. C at 4. Thus, MCAAP does not escape rising rates for Federal Energy, or for PSO Energy.

The setoff formula, however, ensures that MCAAP does not sell its Federal Energy to PSO for less than MCAAP's cost. Compl. Ex. A at 22. MCAAP is not insulated from rising hydro power costs, but neither is PSO. The setoff formula creates a pass-through of Federal Energy to MCAAP, where the Federal Energy consumed by MCAAP is delivered by PSO, and MCAAP reduces its PSO bill, which includes both Federal Energy and PSO Energy, by the cost of the Federal Energy, and by inapplicable fuel charges. See id.

The economic benefits provided by the contract to PSO may diminish, especially if the difference in price between relatively expensive thermal energy and relatively cheap hydro energy decreases, as the respective rates for these two types of energy change over time. Neither party has alleged specific facts in this regard. The court notes, however, that changes in applicable rates for energy were anticipated by the contract. The setoff formula is not made irrational or unreasonable by the possibility that PSO may experience fluctuations over time in the profitability of the Electric Service Agreement.

---

**11.** To the extent that the parties dispute whether Federal Energy is delivered to MCAAP, or into PSO's power grid, this is a distinction without a difference. Compare Pl.'s Reply at 8 with Def.'s Reply at 3–4 & n. 2. Whether MCAAP is seen as consuming the Federal Energy, or trading the Federal Energy for an equivalent amount of PSO Energy, the financial benefit of having access to cheap hydro power is the same.

The court has considered plaintiff's arguments based on the contract's plain language and the meaning of the contract as a whole, integrated document. Plaintiff's interpretation of the contract is unreasonable. The court is persuaded that defendant's interpretation of the setoff formula is the only reasonable interpretation of the contract. For these reasons, the court finds that the contract as a whole bases MCAAP's setoff against its payment liability to PSO on the SWPA rate schedule in effect at the time the Federal Energy is scheduled and delivered, and not, exclusively, on the P–90A rate schedule, as initially established.

### C. In the Alternative, Any Ambiguities in the Setoff Formula Would Be Latent Ambiguities, and Would Necessarily Be Construed Against the Drafter of the Formula

▪ Even if plaintiff's interpretation of the setoff formula could be deemed to be a reasonable interpretation consistent with the contract as a whole, the court would be faced with two competing and reasonable interpretations of this contract provision.[12] The contract would then necessarily be deemed to be ambiguous as to the correct SWPA rate schedule to be applied in the setoff formula. *See Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) ("A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language.") (citations omitted). The court would next decide whether or not this contract ambiguity was patent, or latent. *Interwest Constr. v. Brown,* 29 F.3d 611, 614 (Fed.Cir.1994) ("If we conclude that the con-

tract language was ambiguous, we must then determine whether that ambiguity was patent so as to impose a duty to seek clarification, or only latent." (citing *Newsom,* 676 F.2d at 650)). If a contract ambiguity is latent, the drafter's interpretation of the contract provision will not prevail over the reasonable interpretation of the non-drafting party, applying the rule of *contra proferentem. P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355 (Fed.Cir.2002) (citing *IGGC,* 980 F.2d at 1434).

The court finds that if, indeed, the setoff formula is deemed to be ambiguous, any such ambiguity would be latent. The SE item in the setoff formula, reproduced here, does not present an obvious or glaring conflict with any other part of the contract:

> Amount payable in dollars by MCAAP to SWPA for Federal Energy Scheduled for and delivered to MCAAP in accordance with SWPA rate schedule P90A in effect on May 22, 1997. *(Exhibit E).*

Compl. Ex. A at 22. This formula is consonant with the rest of the contract, for the following reasons.

The formula refers to Exhibit E, a document which contains both P–90A and a provision which clearly indicates that P–90A may be superseded. *See* Compl. Ex. A at 68, 92–97. The formula also references Federal Energy, a term which is defined as being inclusive of power scheduled and delivered according to P–90A, and power scheduled and delivered according to other SWPA rate schedules. *See id.* at 20. In addition, the formula identifies P–90A as the current, effective rate for determining the price of power scheduled and delivered in accordance with that schedule. *See id.* at 22. The con-

---

**12.** Nothing in the extrinsic evidence presented by plaintiff convinces the court that defendant's reading of the setoff formula is unreasonable. The best evidence of the intent of the parties to this contract is found within the contract itself. *See Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971) ("The unexpressed, subjective unilateral intent of one party is insufficient to bind the other contracting party . . . .") (citations omitted). Even when, in the alternative, all of plaintiff's extrinsic evidence describing the circumstances surrounding this contract is considered, and every possible effort is made to discern therein the intent of the parties, defendant's interpretation of the setoff for-

mula is reasonable. Because plaintiff's evidence has created no genuine issue of material fact as to the reasonableness of defendant's interpretation of the setoff formula, the court must consider whether the rule of *contra proferentem* applies to this contract provision. *See Gardiner, Kamya & Assocs., P.C. v. Jackson,* 467 F.3d 1348, 1352 (Fed.Cir.2006) (" '[I]f an ambiguity cannot be cleared up by reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties, the ambiguity should be resolved against the party who drafted the contract.' " (quoting *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 455 F.2d 1037, 1044 (1972))).

tract as a whole has other then-current, effective rate schedules attached as exhibits, and contract language indicating that rate schedules may change, and that the parties' payment liabilities would change accordingly.

In this contractual context, there was no reason for MCAAP to question the particular phrasing of the SE item in the setoff formula, especially where the description of the next item in the formula, "ME," suffered from a similar unwieldiness, and, in any case, the formula's definition of SE referenced the SWPA–MCAAP contract, attached to the contract as Exhibit E. *See* Compl. Ex. A at 22. The court finds that any ambiguity in the setoff formula would be latent. *See Community Heating*, 987 F.2d at 1579 (defining a latent ambiguity as being " 'neither glaring nor substantial nor patently obvious' " (quoting *Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 425 F.2d 1260, 1264 (1970))). It is undisputed that PSO drafted the setoff formula. Pl.'s Facts ¶ 32; Def.'s Resp. to Pl.'s Facts ¶ 32. Because any ambiguity in the setoff formula would be latent, and because PSO drafted the setoff formula, PSO's interpretation of the setoff formula cannot prevail in this suit. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 516–17 & n. 3 (Fed.Cir.1992) ("Where such a latent ambiguity exists, the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable." (citing *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir.1988))); *IGGC*, 980 F.2d at 1434 (same).

## CONCLUSION

Defendant's motion for summary judgment is granted as to the interpretation of the contract's setoff formula. The setoff formula mandates that current, effective SWPA rate schedules are to be used in the calculation of the setoff provided to MCAAP against its payment liability to PSO, for the Federal Energy purchased according to those SWPA rate schedules. Because the issue of waiver

has not yet been fully joined, the court cannot rule on that issue at this juncture.[13] The court encourages the parties to consider settlement discussions or alternative dispute resolution (ADR), and notes that this case was assigned to ADR Judge Christine O.C. Miller.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Summary Judgment, filed December 1, 2008, is **DENIED;**

(2) Defendant's Cross Motion for Summary Judgment, filed January 15, 2009, is **GRANTED;**

(3) The parties shall **FILE**, on or before **August 31, 2009**, a **Joint Status Report** proposing a schedule for further proceedings in this case; and,

(4) Each party shall bear its own costs.

---

13. Although the parties have discussed waiver to some extent in their briefs, neither party requested judgment on this issue. *See* Pl.'s Mot. at 2; Def.'s Mot. at 1; *see also* Jt. Mot. to Enter Scheduling Order at 1 (describing waiver as an issue that will remain after the court has decided the parties' cross-motions for summary judgment). On the subject of waiver, the court notes that the Power Agreement contains a non-waiver clause, which may have some relevance to the parties' positions on this issue. *See* Compl. Ex. A at 27.